UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

|  |  |
|---|---|
| WEEKEND WARRIOR CLOTHING, LLC,<br><br>    *Plaintiff*,<br><br>v.<br><br>AMAZON.COM SERVICES, LLC;<br>AMAZON.COM, INC.,<br><br>    *Defendants*. | Case No.: 1:23-CV-00752<br><br>Judge:  Douglas R. Cole<br>Magistrate Judge Stephanie K. Bowman<br><br>**ORAL ARGUMENT REQUESTED** |

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF WEEKEND WARRIOR CLOTHING, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................8

II.  SUMMARY OF ARGUMENT ..............................................................................9

III.  THE COURT SHOULD DENY AMAZON'S MOTION FOR SUMMARY JUDGMENT. ........................................................................................................12

    A.  Amazon is liable for direct copyright infringement. ...............................12

        1.  Amazon mischaracterizes the volitional-conduct doctrine. .......................12

        2.  Amazon directly causes infringement of the WW Designs consistent with the volitional-conduct doctrine. ........................................................16

    B.  Alternatively, Amazon is liable for contributory copyright infringement. ............18

    C.  Alternatively, Amazon is liable for vicarious copyright infringement. .................20

IV.  THE COURT SHOULD DENY AMAZON'S PARTIAL SUMMARY JUDGMENT ARGUMENTS ..........................................................................21

    A.  The 21 WW Designs are not unlawful derivative works. ........................21

        1.  The 21 WW Designs do not infringe the Other Works' protectable expression, if any. ....................................................................................23

        2.  Any substantial similarity between the 21 WW Designs and the Other Works results from fair use. .............................................................25

    B.  The DMCA does not shield Amazon's infringement of any WW Design. ...........42

        1.  Amazon is not eligible for the DMCA defense because it failed to reasonably implement a repeat-infringer policy. .......................................42

        2.  Even if Amazon is eligible under Section 512(i), it fails to establish Section 512(c) immunity as a matter of law. ..............................................47

            a.  The images on Merch are not stored at the direction of the user. ......................................................................................................48

            b.  Amazon had red-flag knowledge of the Unsold Listings and did not expeditiously remove them. ...............................................49

    C.  Amazon's Attorneys' Fees Argument is Premature ...............................56

    D.  The Court should not grant partial summary judgment as to the Five Copyrights identified by Amazon. .............................................................57

        1.  Amazon had fair notice of King of the Kill and St. PatRizz Day. .............57

         2.  The Beleaguered Livers and the Ameri-CAN who got Away ...................59

    E.  Amazon willfully infringed the WW Designs. .......................................62

V.  CONCLUSION.....................................................................................................67

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*Am. Fam. Mut. Ins. Co. v. Hollander*,
    705 F.3d 339 (8th Cir. 2013) ........................................................................12, 58, 59

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
    11 F.4th 26 (2d Cir. 2021) *aff'd sub nom., Warhol* ....................................24, 27, 28

*Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*,
    598 U.S. 508 (2023) (*Warhol*) ....................................................... *passim*

*Atari Interactive, Inc. v. Redbubble, Inc.*,
    515 F. Supp. 3d 1089 (N.D. Cal.) ................................................................... *passim*

*Average Joe's Ent. Grp., LLC v. SoundCloud, LTD.*,
    2018 WL 6582829 (M.D. Tenn. Oct. 17, 2018) ..............................................14, 15

*Bell v. Worthington City Sch. Dist.*,
    2020 WL 2905803 (S.D. Ohio June 2, 2020) ......................................................26

*Bill Graham Archives v. Dorling Kindersley Ltd.*,
    448 F.3d 605 (2d Cir. 2006)........................................................................37

*Bleistein v. Donaldson Lithographing Co.*,
    188 U.S. 239 (1903) (Holmes, J.) ......................................................................28

*Bridgeport Music, Inc. v. UMG Recordings, Inc.*,
    585 F.3d 267 (6th Cir. 2009) ......................................................................48, 66

*Broad. Music, Inc. v. Meadowlake, Ltd.*,
    754 F.3d 353 (6th Cir. 2014) ......................................................................10, 20

*Brownmark Films, LLC v. Comedy Partners*,
    682 F.3d 687 (7th Cir. 2012) ............................................................................30

*BWP Media USA, Inc. v. T & S Software Assocs., Inc.*,
    852 F.3d 436 (Mar. 27, 2017) ............................................................................14

*Campbell v. Acuff-Rose Music, Inc.*,
    510 U.S. 569 (1994)........................................................................ *passim*

*Canvasfish.Com, LLC v. Pixels.Com, LLC*,
    2024 WL 885356 (W.D. Mich. Mar. 1, 2024)......................................................47

*Capitol Records, LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016)........................................................................49

*Cariou v. Prince*,
714 F.3d 694 (2d Cir. 2013)..........................................................................................*passim*

*Columbia Pics. Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ......................................................................................51, 54

*Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*,
106 F.3d 284 (9th Cir. 1997), *rev'd on statutory damages grounds sub nom.*,
*Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998)......................................63

*Corbis Corp v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004)..............................................................................49

*Ducks Unlimited, Inc. v. Boondux LLC*,
2017 WL 3579215 (W.D. Tenn. Aug. 18, 2017)....................................................................63

*Dunham v. Lei*,
2021 WL 4595808 (C.D. Cal. June 7, 2021) ..........................................................................18

*Ellison v. Robertson*,
357 F.3d 1072 (2004)........................................................................................................43, 47

*Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*,
499 U.S. 340 (1991)..........................................................................................................25, 27

*Flowers, Inc. v. Springhill Floral & Gift Supply Co.*,
2025 WL 3003931 (N.D. Ohio Oct. 27, 2025) ..........................................................10, 12, 15

*Google LLC v. Oracle*,
593 U.S. 1 (2021)..............................................................................................................26, 33

*H-D USA v. SunFrog, LLC*,
311 F. Supp. 3d 1000 (E.D. Wis. 2018)......................................................................13, 15, 63

*Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*,
58 F.3d 1093 (6th Cir. 1995) ..................................................................................................26

*Hiller, LLC v. Success Grp. Int'l Learning Alliance, LLC*,
976 F.3d 620 (2020)................................................................................................................24

*Int'l Bhd. of Elec. Workers Loc. Union No. 212, AFL-CIO, CLC v. Tri-M Grp., LLC*,
2006 WL 8443075 (S.D. Ohio Nov. 15, 2006)..................................................................11, 56

*Keeling v. Hars*,
809 F.3d 43 (2d Cir. 2015).........................................................................................24, 25, 30

*King Recs., Inc. v. Bennett*,
438 F. Supp. 2d 812 (M.D. Tenn. 2006)..................................................................................66

4

*Kohus v. Graco Children's Prods. Inc.*,
    13 F. Supp. 3d 829 (S.D. Ohio 2014) ....................................................................13

*Kohus v. Mariol*,
    328 F.3d 848 (6th Cir. 2003) ...................................................................... *passim*

*Leibovitz v. Paramount Pics. Corp.*,
    137 F.3d 109 (9th Cir. 1998) ...................................................................... *passim*

*Lexmark Intern., Inc. v. Static Ctrl. Components, Inc.*,
    387 F.3d 522 (6th Cir. 2004) (abrogated on other grounds).................................26

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ......................................................................48, 49

*Mayimba Music, Inc. v. Sony Corp. of Am.*,
    2014 WL 5334698 (S.D.N.Y. Aug. 19, 2014)...............................................22, 23

*Michael Grecco Prods., Inc. v. Fandom, Inc.*,
    2025 WL 1675668 (C.D. Cal. May 9, 2025) .................................................65, 66

*Milo & Gabby, LLC v. Amazon.com, Inc.*,
    2015 WL 4394673 (W.D. Wash. July 16, 2015) .................................................49

*Morgan v. Union Metal Mfg.*,
    757 F.2d 792 (6th Cir. 1985) ............................................................................56

*NCR Corp. v. Korala Assocs., Ltd.*,
    512 F.3d 807 (6th Cir. 2008) .......................................................................10, 19

*North Coast Indus. v. Jason Maxwell, Inc.*,
    972 F.2d 1031 (9th Cir. 1992) ...........................................................................25

*Palladium Music, Inc. v. EatSleepMusic, Inc.*,
    398 F.3d 1193 (10th Cir. 2005) ........................................................................23

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) ....................................................................43, 47

*Perfect 10, Inc. v. Giganews, Inc.*,
    847 F.3d 657 (9th Cir. 2017) .................................................................14, 15, 44

*Philpot v. LM Comms II of South Carolina*,
    343 F. Supp. 3d 694 (E.D. Ky. 2018) .................................................................66

*Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*,
    93 F.4th 989 (6th Cir. 2024) ................................................................22, 24, 27

*Princeton Univ. Press v. Michigan Document Servs., Inc.*,
  99 F.3d 1381 (6th Cir. 1996) ...........................................................................22, 42

*Reed Elsevier, Inc. v. Muchnik*,
  559 U.S. 154 (2010)..........................................................................................58

*RJ Control Consultants, Inc. v. Multiject, LLC*,
  100 F.4th 659 (6th Cir. 2024) ...........................................................................23

*Russell v. Walmart, Inc.*,
  2023 WL 5506705 (C.D. Cal. Aug. 17, 2023)......................................................18

*SA Mucis LLC v. Apple, Inc.*,
  592 F. Supp. 3d 869 (N.D. Cal.) ........................................................................66

*Soloski v. Adams*,
  600 F. Supp. 2d 1276 (N.D. Ga. 2009) ...............................................................56

*Sony BMG Music Entm't v. Willis*,
  2008 WL 2120837 (S.D. Ohio May 19, 2008) .....................................................13

*Sony Corp. of Am. v. Universal City Studios, Inc.*,
  464 U.S. 417 (1984)..........................................................................................19

*Sony/ATV Music Publ'g LLC v. 1729172 Ontario, Inc.*,
  2018 WL 4007537 (M.D. Tenn. Aug. 20, 2018) ..................................................62

*Stokes v. Brinor, Inc.*,
  683 F. Supp. 3d 713 (N.D. Ohio 2023)................................................................13

*Sutherland v. Michigan Dep't of Treasury*,
  220 F. Supp. 2d 815 (E.D. Mich. 2001)...............................................................56

*Ventura Content, Ltd. v. Motherless, Inc.*,
  885 F.3d 597 (9th Cir. 2018) ...............................................................45, 46, 48

*VHT, Inc. v. Zillow Grp., Inc.*,
  918 F.3d 723 (9th Cir. 2019) ...............................................................16, 66

*Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*,
  18 F.3d 502 (7th Cir. 1994) ...............................................................63, 64, 65

## **STATUTES**

17 U.S.C. § 103(a) ...........................................................................................24

17 U.S.C. § 106...........................................................................................22, 26

17 U.S.C. § 512(i)(1)(A)................................................................................11, 43

17 U.S.C. § 512(c) ............................................................................................. 11, 47, 48, 49

17 U.S.C. § 512(c)(3) .................................................................................................. 44

The Copyright Act ...................................................................................................... 24

Copyright Act .................................................................................................. 12, 28, 41

DMCA ............................................................................................................... *passim*

## **RULES**

Local Rule 7.2(a)(3) ..................................................................................................... 9

Rule 1 ........................................................................................................................... 57

Rule 12(b)(6) ............................................................................................................... 30

Rule 15(b) .................................................................................................................... 57

Rule 15(b)(2) ................................................................................................. 11, 57, 59

Rule 30(b)(6) ............................................................................................................... 59

Rule 50 ......................................................................................................................... 18

## I.    <u>INTRODUCTION</u>

Amazon put the old print shop out of business. Before Amazon ran them out of town, print shops were just that—a place to print. Anybody from anywhere could step inside, no questions asked, and pay the shopkeep to use his printer. Usually, the shopkeep had no reason to even look at what the customers wanted to print: Just step inside, print their papers, pay up, and out the door they went. No contracts, no relationship with the customers or their designs, no real involvement with the designs beyond ownership of the machine that could print them out. And because of this lack of real involvement, no copyright infringement liability for the shopkeep.

Amazon is nothing like that shopkeep. Its doors are closed unless its users knock, and it can take days before deciding whether to let them into its empire—"Merch on Demand." If they get inside, they don't simply print and leave; Amazon grabs the reins. Amazon takes the design they give it and creates a webpage that displays the design on all kinds of different articles Amazon selects—t-shirts, phone cases, tote bags—available for anyone in America to buy. Amazon controls that buy; it retains final say over the price and any royalties it pays the user, is the seller of record for all sales, and refers to the user as a "███████." More than selling the products, it manufactures them. Its employees and contractors emblazon the designs onto physical products it keeps at fulfillment centers it controls. It ships those products all over the country and they arrive at their destination in Amazon boxes. Its name and handiwork are all over every step of Merch.

Another key difference from the old print shop owner is that Amazon has extensive control over what its users can ask Amazon to print. It ███████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████. Once the design is up, Amazon is

supposed to follow the rules and remove images that copyright holders request Amazon scrap. Its failure to do so brings it before this Court.

Tim Whelan, co-founder of Weekend Warrior Clothing, LLC ("WW"), submitted numerous, valid removal requests through Amazon's proper channels, specifically documenting not just individual WW Designs being ripped off, but showing Amazon his company's entire catalogue. Human ███████████████████████████████████ ██████████████████, as explained in WW's opening brief. But worse, they ██████████ ██████████████████████████████████████████—until his company was forced to sue. Worse yet, human Amazon employees ████████████████████ ██████████████████████████████████████████ ████████. Instead, they lied, telling him repeatedly that his notices, not ██████████████. were the reason exact copies of the WW Designs pervaded Merch, with Amazon selling them by the thousands.

Amazon closes its motion by arguing "treating these services as infringers when they do not have *knowledge* of the infringing third-party designs would not only cripple an entire sector of legitimate commerce, but would also expose traditional brick-and-mortar print shops to the same risk every time a customer walks in with a design." ECF No. 73 at PageID 7180. Don't buy Amazon's premise; it knew the designs it allowed on its website infringed WW's Designs. A decision finding Amazon liable would not threaten the few print shops that survived Amazon's takeover. Such a decision would hold, as the law already requires, that you can't infringe copyrights for profit, especially when the artist is insisting you stop.

## II.     SUMMARY OF ARGUMENT

In accordance with Local Rule 7.2(a)(3), WW provides the following summary of

argument:

Amazon is liable for direct copyright infringement. The Court need not apply the volitional-conduct doctrine because no statute or binding authority requires it. Even if the Court applies the volitional-conduct doctrine, Amazon's conduct here satisfies it because it remains strictly liable for copyright infringement it commits. *See*, *e.g.*, *Flowers, Inc. v. Springhill Floral & Gift Supply Co.*, 2025 WL 3003931, at *4 (N.D. Ohio Oct. 27, 2025) ("The volitional conduct requirement does not change that copyright infringement is a strict liability claim.") Courts have applied the volitional-conduct doctrine to print-on-demand companies whose conduct is less culpable than Amazon's here. *See*, *e.g.*, *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1111–12 (N.D. Cal.).

Alternatively, Amazon could be liable for contributory infringement, which requires (1) direct copyright infringement; (2) knowledge by the defendant (or reason to know) that the third-party was directly infringing; and (3) the defendant's material contribution to the infringement." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008). All elements are present here because Amazon knew or had reason to know of direct copyright infringement against WW committed by Amazon content creators through numerous valid, but rejected notices.

Alternatively, Amazon could be liable for vicarious infringement. A defendant is liable for vicarious infringement if the defendant "profit[ed] from [the] infringement while declining to exercise a right to stop or limit it." *Broad. Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014). Amazon controls who can post on Merch, and what they can post, and, despite numerous valid notices of claimed infringement by WW, declined to stop or limit it, reaping a profit.

Amazon's motion for partial summary judgment should be denied as well.

First, the 21 WW Designs are not unlawful derivative works because they are not substantially similar in protectable expression to any of the works from which Amazon claims they are derived. *Kohus v. Mariol*, 328 F.3d 848, 858 (6th Cir. 2003) ("*Kohus*") (affirming that because no reasonable person could conclude accused drawings were substantially similar to originals, accused drawings did not infringe derivative-work right of originals). Additionally, even if the WW Designs could be construed as unlawful derivative works, they fairly use any copied protectable expression under *Warhol*, *Campbell*, and numerous other authorities.

Second, Amazon is not entitled to DMCA immunity in this action because it has not adopted and reasonably implemented a policy against repeat infringers. 17 U.S.C. § 512(i)(1)(A). Even if the Court determines otherwise, Amazon cannot establish as a matter of law entitlement to safe harbor under Section 512(c) because the images on Merch are not stored at the direction of the user, Amazon had red-flag knowledge of infringement of the Unsold Listings and did not expeditiously remove them, and amazon had the right and ability to control the infringement on Merch and benefitted from the infringement of the Unsold Listings.

Third, Amazon's attorneys'-fees argument is premature because no prevailing party has been determined in the case and the Court and parties lack any important information about the amount or reasonableness of hours worked and fees expended. *Int'l Bhd. of Elec. Workers Loc. Union No. 212, AFL-CIO, CLC v. Tri-M Grp., LLC*, 2006 WL 8443075 at *2 (S.D. Ohio Nov. 15, 2006) ("it has always been the practice of this court to address attorney's fees at the conclusion of the merits").

Fourth, Amazon had fair notice of WW's infringement claims against King of the Kill and St. PatRizz Day, and Rule 15(b)(2) permits and encourages their inclusion in this action. Amazon has had actual notice of the claims since the filing of the First Amended Complaint, and any

prejudice it claims is of its own making. *Am. Fam. Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013). Amazon also had fair notice of WW's claims as to Shut Up Liver, and WW discusses clear infringement of that work herein of which Amazon has been on notice since early in the case. Down Goes Liver was never pleaded in this case—though Amazon did pilfer the design beyond doubt—and its inclusion in WW's list of accused infringements resulted from a simple mistake. WW requests Ameri-CAN V2 remain in the case despite no located infringements, but would be willing to drop the claim upon sufficient guarantees from Amazon that it would continue to monitor for future infringements of the work.

Finally, Amazon is liable for willful infringement as a matter of law because it intentionally, systematically ignored WW's valid notices of claimed infringement, as set out in WW's opening brief.

## III. THE COURT SHOULD DENY AMAZON'S MOTION FOR SUMMARY JUDGMENT.

### A. Amazon is liable for direct copyright infringement.

#### 1. Amazon mischaracterizes the volitional-conduct doctrine.

Before describing how Amazon misinterprets the volitional-conduct doctrine, WW notes this Court is not bound to apply it in the first place. The Copyright Act never uses the words "volitional conduct." Nor has any Supreme Court majority ever established that a defendant must perform "volitional conduct" to be directly liable. No Sixth Circuit decision has required volitional conduct for direct infringement, either. Rather, district courts in the Sixth Circuit repeatedly emphasize that copyright infringement is a strict-liability offense, even if those courts elect to apply the volitional conduct doctrine. *See, e.g., Flowers, Inc. v. Springhill Floral & Gift Supply Co.*, 2025 WL 3003931, at *4 (N.D. Ohio Oct. 27, 2025) ("The volitional conduct requirement

does not change that copyright infringement is a strict liability claim;"); *Stokes v. Brinor, Inc.*, 683 F. Supp. 3d 713, 724 (N.D. Ohio 2023) (" . . . as a strict liability offense, lack of knowledge is no defense"); *Kohus v. Graco Children's Prods. Inc.*, 13 F. Supp. 3d 829, 838 (S.D. Ohio 2014) ("Copyright infringement is a strict liability offense; Plaintiff need not demonstrate Defendant's intent to infringe, or even knowledge of infringement, in order to prove copyright infringement") (quoting *Sony BMG Music Entm't v. Willis*, 2008 WL 2120837, *3 (S.D. Ohio May 19, 2008)). This is a natural interpretation of bedrock intellectual-property law: "**In patent, trademark . . . and copyright cases, any member of the distribution chain of allegedly infringing products can be jointly and severally liable for the alleged misconduct.**" *Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1101 (N.D. Cal. 2021), *aff'd in part, appeal dismissed in part* , 2023 WL 4704891 (9th Cir. July 24, 2023) (citing *H-D USA v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1029–30 (E.D. Wis. 2018) (**liability for a print-on-demand business that made goods based on customer-uploaded design**).

On the merits, Amazon's framing of the volitional-conduct doctrine is far afield from almost every courts' (district and circuit) view of the rule. Its framing would insulate every "system owner" from almost any claim of direct infringement, no matter the scope of that system owner's direct involvement in the infringement of those using the system. Amazon states, as if it was unquestionable black-letter law:

> "To meet the volitional conduct requirement, a plaintiff must show 'a relationship between the system owner and the copyrighted work that will permit the owner to prevent infringement of the work without the necessity of monitoring the behavior of third parties.' *Tomelleri* [*v. SunFrog, LLC*], 721 F. Supp. 3d [566,] 576 [(E.D. Mich. Mar. 5, 2024)] (quoting Robert C. Denicola, *Volition and Copyright Infringement*, 37 Cardozo L. Rev. 1259, 1276 (2016))."

ECF No. 72 at PageID 6984). This is not the law—in this circuit or in any other. It is a misleadingly-cherry-picked overstatement from a law-review article's ("*Denicola*") incorrect

generalization about the state of the law. *See Denicola* at 1276 & 1295. *Denicola* itself, and the two cases that have cited the overstatement since its publication nine years ago, contradict the vast majority of decisions that apply the volitional-conduct doctrine, including those cited by Amazon. *See*, *e.g.*, *BWP Media USA, Inc. v. T & S Software Assocs., Inc.*, 852 F.3d 436, 440 n.1 (Mar. 27, 2017) (recognizing "the word 'volition' in this context does not really mean an 'act of willing or choosing' or an 'act of deciding' . . . [**volition**] **'stands for the unremarkable proposition that proximate causation historically underlines copyright infringement liability no less than other torts'**") (citing *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017) (emphasis added); *Average Joe's Ent. Grp., LLC v. SoundCloud, LTD.*, 2018 WL 6582829, at *4 (M.D. Tenn. Oct. 17, 2018) ("As its name suggests, direct liability must be premised on conduct that can reasonably be described as the direct cause of the infringement") (citing *Giganews*, 847 F.3d at 666)).

The Court should not let Amazon morph the volitional-conduct doctrine from a (discretional) causation requirement to unchecked immunity for system owners regardless of how they use the system. *Amazon's* lead case, *Tomelleri v. SunFrog*, is critically distinguishable. 721 F. Supp. 3d 566 (E.D. Mich. 2024). Decided a motion to dismiss a complaint "light on detail," (at 572), it did "not discuss the Defendants, their business, or their infringing products beyond alleging Defendants were . . . in the business of marketing, promoting, advertising, and selling apparel, and that some merchandise displayed [plaintiff's] copyrighted illustrations or their derivatives;" "indeed, plaintiff's complaint did not specify whether he was asserting direct or secondary copyright infringement against Defendants." *Id.* at 573 (cleaned up). Crucially, "**nor did plaintiff plausibly allege that any Defendant was responsible.**" *Id.* (emphasis added). The circumstances of the case alone put it on unequal footing with WW's. It also notes, relevantly here, that "the

volitional conduct requirement seeks to limit direct copyright infringement liability only when a non-infringing online provider is directly linked to the specific work that has been copied." *Id.* at 575 (citing Denicola). As discussed in the next section, WW's evidence directly links Amazon to all of the infringing conduct at issue in this case.

On a full record in another case, the same defendant, SunFrog, was deemed a willful trademark infringer. *See H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1039–41 (E.D. Wisc.) (slamming print-on-demand company for willful infringement for failing to stop repeat infringers despite knowing their identities as a result of numerous takedown notices, even when SunFrog removed the products subject to the notices, because "identical or similar designs popped up again just as quickly, often by the same designers or sellers" and "the removal process frequently took days, despite plaintiff providing direct links to the offending pages;" and noting that even though plaintiff's notices were not literally ignored, "SunFrog failed time and again to develop reforms to its practices that actually addressed the problem in a meaningful way") (cleaned up). Further, the Northern District of Ohio found volitional conduct where:

> "'Volitional' must not be mistaken for 'intentional' or 'knowing.' The volitional conduct requirement does not change that copyright infringement is a strict liability claim . . . As a strict liability offense, lack of knowledge is no defense to copyright infringement. Rather, the **volitional conduct requirement merely requires "conduct that can reasonably be described as the direct cause of the infringement**." (citing *Average Joe's Ent. Grp., LLC v. SoundCloud, LTD.*, 2018 WL 6582829, at *2 (M.D. Tenn. Oct. 17, 2018) (quoting *Perfect 10, Inc. v. Giganews, Inc.*, 847 F.3d 657, 666 (9th Cir. 2017)) . . . "Defendants purchased, received, marketed, and distributed [infringing] products bearing the designs. Flowers points to pages from defendants' catalogs in which defendants advertise products bearing all ten of the Designs. These facts, undisputed by Ddefendants, establish conduct that can reasonably be described as the direct cause of the alleged infringement of Flowers's exclusive right to distribute copies of the copyrighted work."

*Flowers, Inc. v. Springhill Floral & Gift Supply Co.*, 2025 WL 3003931, at *4 (N.D. Ohio Oct. 27, 2025) (cleaned up).

As discussed below, even if the Court is inclined to apply the volitional-conduct doctrine to this case, Amazon's conduct fits the bill.

### 2. Amazon directly causes infringement of the WW Designs consistent with the volitional-conduct doctrine.

Amazon's actions demonstrate not just volitional, but *willful* conduct. Amazon is no mere passive "system owner;" it is an active, essential participant in the infringement of the WW Designs. *See Atari Interactive, Inc. v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1111–12 (N.D. Cal.) ("*Atari*"), *appealed on other grounds*, 2023 WL 4704891 (9th Cir. July 24, 2023) (stating that the volitional-conduct doctrine requires a party to be the "direct cause" and "actively involved in infringement for direct liability to attach" (citing *VHT, Inc. v. Zillow Grp., Inc.*, 918 F.3d 723, 731 (9th Cir. 2019)).

As to the creators themselves, Amazon plays an active role in determining who can become and remain one. Amazon ███████████████████████████. ECF No. 66-1 ¶¶ 1–6. It reviews and retains the right to terminate creator accounts and listings after they are created. ECF No. 66-1 ¶ 6. ████████████████████████████████. ECF No. 66-1 ¶¶ 7–8, 10.

Its role is also active when it comes to the designs themselves. It determines and stores the articles on which those designs can appear. ECF No. 66-1 ¶ 9; ECF No. 80-2. It s█████████ ████████████████████████████████████████████████████████ ████████████████████████████. ECF No. 66-1 ¶ 14; ECF No. 53 Ex. A.8 at 45:25–47:9, 47:25–48:4. ████████████████████████ ████████████████████████████████████████████████████████. ECF No. 53 Ex. A.8 at 45:25–64:10. It ████████████████████████████████ ████████████████████, respectively. ECF No. 66-1. It publishes a ██████████

███████████████████████. ECF No. 66–1 ¶ 18.

When a customer orders a design, Amazon manufactures products that did not previously exist. ECF No. 66-1 ¶ 20. It ships and handles returns and customer service for products, which arrive in Amazon boxes. ECF No. 66-1 ¶¶ 21–22. It ████████████████████████ (¶¶ 23–24) (ECF No. 66-1 ¶¶ 23–24), lists itself as the "seller of record" of all Merch products (¶ 24) (ECF No. 66-1 ¶ 24), and characterizes Merch creators as ████████████ ECF No. 53 Ex. A.13 ¶ 21.

As to the WW Designs, specifically, Amazon manufactured, shipped, and sold infringements of the WW Designs despite Tim Whelan sending numerous notices of claimed infringement to Amazon for over a year and a half, and Amazon did not remove a single design because of any of Tim's pre-suit notices. ECF No. 66-1 ¶¶ 39, 41–66). Amazon investigators ████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████████████. ECF No. 66-1 ¶¶ 67–84. Amazon sent Tim multiple emails purporting to explain why the notices were being rejected, but never told him the *real* reason—███████████████████—and ████████████████████████. *Id.* ¶¶ 94–96, 98–100. Despite having his phone number and home address, Amazon chose to never call him or discuss with him the notices aside from sending him those misleading emails. *Id.* ¶¶ 86–88. While it ██████████████, Amazon displayed, manufactured, and sold ████████ ███████████ of the WW Designs. *Id.* ¶ 108. And, even after WW filed the Complaint and First Amended Complaint, Amazon continued to display, manufacture, and sell ██████████████ ████ depicting the WW Designs. *Id.* ¶¶ 109–111). Its arguments about "Unsold Listings" are a smokescreen—copyright outlaws display and the creation of derivative works just as much as reproduction, and Amazon violated all of those exclusive rights.

Print-on-demand companies and other "system owners" *far less* active than Amazon have been found to satisfy the volitional-conduct requirement. *See*, *e.g.*, *Atari*, 515 F. Supp. 3d at 1113:

> (finding a question of material fact over whether Redbubble acts with volitional conduct for "hold[ing] itself out as the seller of the goods on its website . . . offer[ing] those items for sale and then facilitate[ing] or caus[ing] their creation and delivery, with no involvement from the artists who uploaded the designs. Even though each step is performed automatically by a computer, the acts remain volitional because Redbubble designed its software to accomplish those tasks and for its own financial benefit. Moreover, Redbubble exercises control over every aspect of the sale, from manufacturing to shipping and returns, and thus holds the best position to prevent infringement. Accordingly, since Redbubble actively instigates and exercises control over the sales on its website, a reasonable jury could find that Redbubble is liable for direct infringement of Atari's copyright distribution rights.");

*Russell v. Walmart, Inc.*, 2023 WL 5506705, at *6 (C.D. Cal. Aug. 17, 2023):

> (denying Rule 50 motion seeking to overturn verdict for plaintiff on direct infringement because of evidence that at-issue products were "sold and shipped by Walmart," that Walmart must approve entities before they can sell through Walmart, that potential Walmart-website users must provide Walmart with product images and descriptions before they are listed, that photographs of products were stored on Walmart's servers and displayed by Walmart, and that Walmart retains "final say when it comes to the content that appears on Walmart.com" and "can essentially override the decisions in the content uploaded by the suppliers.");

*Dunham v. Lei*, 2021 WL 4595808, at *4 (C.D. Cal. June 7, 2021) (rejecting motion to dismiss arguing lack of volitional conduct because of allegations that "Defendants have exercised control over the copying, storage, and distribution of Dunham's copyrighted works by manufacturing, marketing, and selling the items").

If the Court applies the volitional-conduct requirement to this case (which it need not do), it should look beyond Amazon's self-serving framing and adopt one consistent with the majority of other courts'. It should also conclude that Amazon's direct involvement clears the hurdle.

### B. Alternatively, Amazon is liable for contributory copyright infringement.

Amazon misstates WW's contributory infringement theory to defeat an argument WW

does not make. It claims, falsely, that "Weekend Warrior's principal theory is that because Amazon provided the means—a website—through which the third parties could sell goods with the allegedly infringing material, it is liable." ECF No. 73 at PageID 7140. To burn this strawman, it emphasizes that "the mere sale of 'copying equipment' or 'other articles of commerce[] does not constitute contributory infringement if the product is widely used for legitimate, unobjectionable purposes," and that "for a defendant to defeat a contributory infringement claim, it need only show that the equipment or service it provided is 'capable of substantial noninfringing uses.'" *Id.* (citing *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 442 (1984)).

What Amazon fails to mention is the elements of an ordinary contributory infringement claim set out by the Sixth Circuit: (1) direct copyright infringement; (2) knowledge by the defendant (or reason to know) that the third-party was directly infringing; and (3) the defendant's material contribution to the infringement." *NCR Corp. v. Korala Assocs., Ltd.*, 512 F.3d 807, 816 (6th Cir. 2008). WW does not allege that Amazon's mere creation of Merch allowed Merch creators to infringe, rendering Amazon liable for all products Amazon then sells through Merch. WW provides evidence of much more.

First, Amazon knew or had reason to know that Merch creators were uploading infringements of the WW Designs to Merch (ECF No. 66-1 ¶¶ 41–66. Second Amazon materially contributed to (1) the creation of derivative works of those designs by choosing the articles on which Merch listings display them (*id.* ¶ 9), and displaying them accordingly (*id.* ¶¶ 112–113), and (2) sale of products bearing those designs by handling every step in the process besides creating the designs themselves. *Id.* ¶¶ 9, 20–24. Potential non-infringing uses of Merch do not negate infringing ones when Amazon knows or has reason to know of that infringement, and as shown above, Amazon had plenty of reasons to know.

19

Amazon's longshot backup argument is that WW's notices were "plainly insufficient to create knowledge" (making no mention of "reason to know"). ECF No. 72 at PageID 6989. The evidence belies this claim. As discussed at length in WW's MSJ, Tim Whelan provided Amazon with thorough, DMCA-compliant notices, answering Amazon's clarifying questions every step of the way. ECF No. 66-1 ¶¶ 39, 41–65). Amazon intentionally, ███████ rejected those notices until WW sued, and still sold thousands of infringements throughout litigation. ECF No. 66-1 ¶¶ 67–84, 94–96, 98–100, 108–111).

## C. Alternatively, Amazon is liable for vicarious copyright infringement.

Even if the Court finds that the facts of this case comport with a theory of vicarious infringement, rather than direct or contributory, Amazon's actions fit the bill. A defendant is liable for vicarious infringement if the defendant "profit[ed] from [the] infringement while declining to exercise a right to stop or limit it." *Broad. Music, Inc. v. Meadowlake, Ltd.*, 754 F.3d 353, 354 (6th Cir. 2014). "The first half of the test . . . asks whether the defendant had the right and ability to supervise the infringing conduct." *Id.* "The second half of the test asks whether the defendant had an obvious and direct financial interest in the infringement." *Id.*

Amazon controls who can post on Merch, and what they can post; Amazon can terminate any user and any design for any reason at any time. ECF No. 66-1 ¶¶ 1–14. It controls the number of designs creators can upload, and monitors those designs for policy violations and infringement before and while they appear on Merch. *Id.* & ¶¶ 16; ECF No. 53 Ex. A.8 at 45:25–47:9, 47:25–64:10. The financial benefit is just as clear: Amazon ████████████████████ ██████████████████, bringing in more customers. ECF No. 66-1 ¶¶ 16–19; ECF No. 80-8 & 80-9. And most obviously, Amazon diverts sales by manufacturing, shipping, and selling the designs—in Weekend Warrior's case, to the tune of ██████████████.

*Id.* ¶¶ 20–25, 106–110.

The Court should treat infringement on Merch as presenting direct-infringement issues. But if the Court disagrees, the evidence supports Amazon's liability for contributing to, or being vicariously liable for, the infringement committed by Merch creators. Amazon's motion must be denied.

## IV.  THE COURT SHOULD DENY AMAZON'S PARTIAL SUMMARY JUDGMENT ARGUMENTS

### A.  The 21 WW Designs are not unlawful derivative works.

Amazon cannot reasonably dispute that it displayed and/or sold exact or near-exact copies of the WW Designs. Faced with this dilemma, it seeks to excuse its pixel-for-pixel infringement by arguing that 21[1] of the WW Designs are not original or protectable at all because they are "unlawful derivatives." ECF No. 72 at PageID 6997. "Unlawful derivatives," of course, which Amazon did not hesitate to display all over its website and manufacture into products to ship all over the country. Amazon's gambit must fail for two reasons.

*First*, the 21 WW Designs are not unauthorized derivatives at all because they are not substantially similar to any of the works from which Amazon claims they are derived (the "Other Works"). Bedrock copyright law—which appears nowhere in Amazon's brief—holds that the WW Designs are only unlawful derivatives of the Other Works if they infringe the Other Works. *Kohus v. Mariol*, 328 F.3d 848, 858 (6th Cir. 2003) ("*Kohus*") (affirming that because no reasonable

---

[1] (1) Uncle Sam's American Lager; (2) I Want Brew; (3) Papa Woody Plumbing; (4) Fantasy Football Legend; (5) Bad Day to be a Cerveza; (6) Griddy Cerveza; (7) Bad Day to be a Beer - *America Edition*; (8) Ameri-CAN Eagle; (9) Meri-CAN Eagle; (10) Ameri-CAN V2; (11) Poor Day to be a Pilsner; (12) Real American – Uncle Sam; (13) Ameri-CAW; (14) Bad Day to be a Beer – Christmas Edition; (15) Can't Get Hungover; (16) Do You Feel Lucky; (17) Pat McCrotch; (18) Enjoy Beer; (19) Enjoy Beer – Ugly Sweater; (20) Make Mullets Great Again; (21) Protect the Charms. Amazon's MSJ, Appx. B.

person could conclude accused drawings were substantially similar to originals, accused drawings did not infringe derivative-work right of originals) (remanding on other grounds) (relying on *Nimmer on Copyright* § 3.01 (1991)); *see also Mayimba Music, Inc. v. Sony Corp. of Am.*, 2014 WL 5334698, at *21 (S.D.N.Y. Aug. 19, 2014) ("*Mayimba Music*") (citing *Kohus* for the proposition that "[t]he only way . . . to prove" that the remix of a song was a derivative of the original song would be "to prove that the remix illegally copies [the original] song because a substantial similarity exists between the remix and the protectable elements of [the original] song"), *suspended on other grounds*, 2015 WL 6917260 (S.D.N.Y. Apr. 30, 2015).

Side-by-side comparisons of the 21 WW Designs and the Other Works reveal the opposite: the WW Designs are original, and even where they incorporate or reference aspects of the Other Works, they demonstrate protectable originality in "choices about style and setting" and "decisions about what materials to include and how to organize them." *Premier Dealer Servs., Inc. v. Allegiance Adm'rs, LLC*, 93 F.4th 989, 989 (6th Cir. 2024) ("*Premier Dealer*") (arrangement of sections and "express[ion] of the idea of covering damages to a car" in a dealer's warranty certificate showed sufficient originality).

*Second*, even if the Court concludes that the WW Designs could be substantially similar to protectable expression of the Other Works, the WW Designs fairly use that expression. The right to prepare derivative works is "subject to" fair use. *Andy Warhol Foundation for the Visual Arts, Inc. v. Goldsmith*, 598 U.S. 508, 239 (2023) (*Warhol*) (citing 17 U.S.C. § 106). **The fair-use doctrine "permits [and requires] courts to avoid rigid application of the copyright statute when, on occasion, it would stifle the very creativity which that law is designed to foster."** *Princeton Univ. Press v. Michigan Document Servs., Inc.*, 99 F.3d 1381, 1385 (6th Cir. 1996).

Stifling creativity is precisely what Amazon seeks to do here. It seeks to destroy the rights

protecting Dan Whelan's original and often parodic creations so that it and anyone else can copy them far and wide and get off scot-free. Precedent at every level of the federal system demands otherwise because the 21 WW Designs do not "supersede the objects of the originals;" rather, they "add something new, with a further purpose or different character, altering the [originals] with new expression, meaning, or message." *Leibovitz v. Paramount Pics. Corp.*, 137 F.3d 109, 112 (9th Cir. 1998) (citing *Campbell v. Acuff-Rose Music, Inc.* ("*Campbell*"), 510 U.S. 569, 579 (1994)).

### 1. The 21 WW Designs do not infringe the Other Works' protectable expression, if any.

It is Amazon's burden to prove that WW's copyrights are invalid, and comes nowhere close. ECF No. 72 PageID 6997 (citing *Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005) (to rebut presumption of validity afforded by copyright ownership, defendant must "offer some evidence or proof to dispute or deny the plaintiff's prima facie case of infringement")). The method of proof Amazon attempts here is to claim that the 21 WW Designs are unauthorized derivatives of the Other Works. To prove the WW Designs are unauthorized derivatives, Amazon must prove that the WW Designs infringe those other works' copyrights, if any exist. *Kohus* at 858; *Mayimba Music*, 2014 WL 5334698, at *21. In turn, to prove WW infringed those copyrights (if they exist) Amazon must show (1) ownership of a valid copyright, and (2) copying of constituent elements that are original. *RJ Control Consultants, Inc. v. Multiject, LLC*, 100 F.4th 659, 667 (6th Cir. 2024) ("*RJ Control*").

But "not all copying is actionable;" *Kohus* at 853. "To determine if a work is entitled to copyright protection, courts consider several 'qualifications,' including [the merger doctrine]." *RJ Control* at 667. The merger doctrine establishes that "when there is essentially only one way to express an idea, the idea and its expression are inseparable [i.e., they merge,] and the copyright is

no bar to copying that expression." *Kohus* at 856.

Besides showing that the WW Designs infringe the Other Works' protectable expression, Amazon must show more. To establish that the WW Designs are unlawful derivatives of the Other Works, Amazon must establish that the Other Works "pervade" the WW Designs. *Hiller, LLC v. Success Grp. Int'l Learning Alliance, LLC*, 976 F.3d 620, 629 (2020); *Keeling v. Hars*, 809 F.3d 43, 51 n.8 (2d Cir. 2015) ("*Keeling*") (rejecting argument that a stage version of the film *Point Break* that "parallels the characters and plot elements from *Point Break* and relies almost exclusively on selected dialogue from the screenplay" "improperly pervaded" the original film). To pervade the WW Designs, the Other Works must "run throughout every part" of them. *Id.* (cleaned up). This is important because "a work can be copyrighted even if it unlawfully incorporates preexisting material;" protection for such a work simply "does not extend to any part of the work in which such material has been used unlawfully." *Id.* Still, copyright originality can come from "choices about style and setting" and "decisions about what materials to include and how to organize them." *Premier Dealer* at 989. And "copyright law protects not only the individual elements themselves, but the creative choices made in selecting and arranging even uncopyrightable elements." *Keeling* at 50.[2]

---

[2] Despite Amazon's argument to the contrary, this is true regardless of whether the work is a compilation. **The "cumulative manifestation of individual artistic choices" resulting in a single photograph—a non-compilation, non-derivative work—have explicitly been considered "what the law ultimately protects."** *See Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 46 (2d Cir. 2021) (holding that a photographer's "posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant involved" embodied the protectable expression in a single work—"the photograph itself") *aff'd sub nom.*, *Warhol* at 508. The Copyright Act itself also shows why copyright protection in selection and arrangement of individual elements of a work are not confined to compilations. 17 U.S.C. § 103(a) ("the subject matter of copyright as specified by section 102 includes compilations *and derivative works* . . . ") (emphasis added); *id.* § 103(b) ("the copyright in a compilation *or derivative work* extends only to the material contributed by the author of such work, as (footnote continued)

Amazon cannot meet its burden to invalidate the WW Designs because they do not infringe any protectable expression in the Other Works. To the extent the Other Works are even protected by copyright at all, Amazon has not come close to proving that the WW Designs infringe them. WW's specific responses to Amazon's allegations otherwise are included in WW's Response to Amazon's Appendix B, which is incorporated herein by reference and will be filed along with this brief. At a high level, the WW Designs are not unauthorized derivatives of the Other Works because (1) Amazon has not provided evidence that many of the Other Works are copyrighted at all, including the scope of any of those copyrights, if they exist; (2) the Other Works' protectable expression is limited by the merger doctrine; (3) what limited protectable expression the Other Works contain, the WW Designs do not infringe because the Other Works do not "pervade" the WW Designs; and (4) even if the WW Designs arguably infringe some protectable expression of the Other Works (they do not), the selection and arrangement of the WW Designs remains protectable. All of these arguments sink Amazon's derivative-work argument *even before the matter of fair use*, which buries the argument.

> 2.      **Any substantial similarity between the 21 WW Designs and the Other**

---

distinguished from the preexisting material employed in the work, and does not imply any exclusive right in the preexisting material") (emphasis added); *Keeling* at 49 ("A close use of the statute therefore makes plain that an unauthorized but lawful fair use employing preexisting copyrighted material may itself merit copyright protection. It is not the invocation of fair use that provides the work copyright protection . . . [i]t is the originality of the derivative work that makes it protectable, and fair use serves only to render lawful the derivative work, such that it may acquire—as would other lawful derivative works—such protection.").

WW avers that whether the WW Designs that incorporate or reference the Other Works are viewed statutorily as "derivative works," "compilations," or neither, they remain original as a matter of law because they "possess at least some minimal degree of creativity . . . no matter how crude, humble, or obvious," *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345–46 (1991), and "all that is needed to satisfy both the Constitution and the [copyright] statute is that the author contributed something more than a merely trivial variation, **something recognizably his own**." *North Coast Indus. v. Jason Maxwell, Inc.*, 972 F.2d 1031, 1033 (9th Cir. 1992) (emphasis added).

**Works results from fair use.**

Fair use is not copyright infringement. *Warhol* at 527 (citing 17 U.S.C. § 106). To determine whether a use is fair, Courts consider (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes; (2) the nature of the copyrighted work; (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and (4) the effect of the use upon the potential market for or value of the copyrighted work." *Warhol* at 528 (citing § 106). The Act's fair use provision "sets forth general principles, the application of which requires judicial balancing, depending upon relevant circumstances." *Google LLC v. Oracle*, 593 U.S. 1, 19 (2021).

WW will apply each of the factors to each of the WW Designs Amazon calls invalid in WW's Response to Amazon's Appendix B. Before diving into the particulars, WW explains the relevant law governing each factor and highlights why each favors WW as a matter of law.

Preliminarily, Amazon is shifting the burden of proof. Amazon asserts that "Weekend Warrior, as 'the party asserting fair use, bears the burden of proof'" on the issue of fair use. ECF No. 72 PageID 7002 (citing *Bell v. Worthington City Sch. Dist.*, 2020 WL 2905803, at *6 (S.D. Ohio June 2, 2020) ("*Bell*")) (cleaned up). Nonsense. In *Bell*, the defendant "assume[d] Plaintiff ha[d] a valid copyright." *Bell* at *5. Despite valid registrations and clearly-original and creative works, Amazon is thus challenging the validity of WW's copyrights—a challenge *Amazon* bears the burden to tackle, not WW. *Lexmark Intern., Inc. v. Static Ctrl. Components, Inc.*, 387 F.3d 522, 534 (6th Cir. 2004) (abrogated on other grounds) (citing *Hi-Tech Video Prods., Inc. v. Capital Cities/ABC, Inc.*, 58 F.3d 1093, 1095 (6th Cir. 1995) This makes intuitive sense, as WW argues that the Court need not even assess fair use because all of the WW Designs are valid, protectable, and sufficiently creative and original, and Amazon copied them completely. Now to the factors.

### *(1) Purpose and Character*:

The first factor "considers the reasons for, and nature of, the copier's use of an original work. *Warhol* at 528. **The central purpose of this investigation is to see . . . whether the new work merely supersedes the objects of the original creation . . . supplanting the original, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message**. *Campbell* at 579 (cleaned up). This factor "relates to the problem of substitution—copyright's bête noire. The use of an original work to achieve a purpose that is the same as, or highly similar to, that of the original work is more likely to substitute for, or supplant, the work." *Warhol* at 528 (cleaned up).

None of the 21 WW Designs supersede or supplant the Other Works. As explained above and in more detail directly below and in WW's Response to Amazon's Appendix B, most of the 21 WW Designs do not even arguably infringe the Other Works. Rather, they are simply different expressions of a similar idea, or of a completely different idea. Even in the rare case where the ideas and expressions are arguably similar, Dan Whelan always injected enough "inventiveness, imagination, and creative spark" to establish the "minimal degree of creativity" required for copyright originality. *Premier Dealer* at 989, *Feist* at 345–46, respectively. His distinct style and artistic choices set the 21 WW Designs far apart from any of the Other Works.

Amazon is dead wrong when it claims, "a work that fails to comment on the original . . . does not qualify [for fair use protection]." ECF No. 73 at PageID 7155. That argument has been explicitly rejected because **artists are allowed to use even protected, expressive works as "raw material" to "transform in the creation of new information, new aesthetics, new insights and understandings**." *Andy Warhol Found. For Visual Arts, Inc. v. Goldsmith*, 11 F.4th 26, 38 (2d Cir. 2021) (citing *Cariou v. Prince*, 714 F.3d 694, 706 (2d Cir. 2013) as "reject[ing] the proposition

that a secondary work *must* comment on the original in order to qualify as fair use," "conclud[ing] that the district court had imposed a requirement unsupported by the Copyright Act" . . . and finding majority of works at issue "transformative as a matter of law" [because] "Prince had incorporated Cariou's serene and deliberately composed portraits and landscape photographs into his own crude and jarring works that incorporated color, featured distorted human and other forms and settings . . . ") (cleaned up) (emphasis in original); *see also Andy Warhol Found.*, 11 F.4th at 38 (affirming that "**the alteration of an original work with new expression, meaning, or message, whether by the use of new aesthetics, by placing the work in a different context, *or by any other means* is the *sine qua non* of transformativeness**" (cleaned up) (emphasis added). Many of the WW Designs do comment on the Other Works, but that commentary is merely sufficient, not necessary, for the first factor to favor WW.

For the WW Designs that do comment on the Other Works, instead of merely using some aspect of them as "raw materials" to create something completely new, WW's victory on the first factor is "obvious." "Parody has an obvious claim to transformative value because it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." *Warhol* at 530 (citing *Campbell* at 579). "**The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived**. Whether, going beyond that, parody is in good taste or bad does not and should not matter to fair use." *Campbell* at 582 (emphasis added). Justice Holmes put it well:

> "It would be a dangerous undertaking for persons trained only to the law to constitute themselves final judges of the worth of [a work], outside of the narrowest and most obvious limits. At the one extreme some works of genius would be sure to miss appreciation. Their very novelty would make them repulsive until the public had learned the new language in which their author spoke."

*Campbell* at 582–83 (citing *Bleistein v. Donaldson Lithographing Co.*, 188 U.S. 239, 251 (1903)

(Holmes, J.)).

Parodies copying extensive amounts of original works are routinely held transformative. *See*, *e.g.*, *Campbell* at 574, 583 & n.17 (parodic song that would be an "uncontested . . . infringement" of the original but for fair use found sufficiently transformative to support first fair-use factor because "fair to say that . . . **song reasonably could be perceived as commenting on the original or criticizing it, to some degree**" . . . with lyrics that "can be taken as a comment on the naiveté of the original" and noting that artist "need not label [the] song a parody in order to claim fair use protection [because p]arody serves its goals whether labeled or not, and **there is no reason to require parody to state the obvious (or even the reasonably perceived)**.") (cleaned up and emphasis added); *Leibovitz v. Paramount Pics. Corp.*, 137 F.3d 109, 112–115 (1998) ("*Leibovitz*") (transformative use despite fact that "great effort was made to ensure that [movie poster of Leslie Nielsen's head grafted onto the body of a naked pregnant woman] resembled in meticulous detail the [photo of a naked, pregnant Demi Moore] taken by Leibovitz," including "digitally enhanc[ing] . . . the skin tone and shape of the body" to make them match Moore's)



(https://www.mondaq.com/canada/advertising-marketing--branding/253026/the-agns-annie-leibovitz-and-the-naked-gun-lesson-in-permissible-parody) (last accessed November 17, 2025;

*Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 689, 692 (7th Cir. 2012) (dismissing as an "obvious case of fair use" copyright complaint under Rule 12(b)(6) even though defendant *South Park*'s accused episode contained version of plaintiff's song that was "very similar . . . recreat[ing] a large portion of the original version, using the same angles, framing, dance moves and visual elements"); *Keeling* at 45, 51 (unauthorized stage version of *Point Break* that "parallels the characters and plot elements from *Point Break* and relies almost exclusively on selected dialogue from the screenplay" . . . had copyright in "the original in which [plaintiff] selected, coordinated, and arranged the elements of . . . her work to create new parodic meaning") (cleaned up).

The "parodic character" in the WW Designs that reference some aspect of the Other Works cannot just "reasonably be perceived;" the perception is *obvious*. *See Campbell* at 582. WW will discuss all of the works in detail in its Response to Amazon's Appendix B, but a few comparisons merit highlighting here.



| Notre Dame Mascot & Lucky Charms Cereal | *Protect the Charms* |
|---|---|
| (AMZ-WWC_00029715, Doc. 56-19.) | (FAC, Doc. 17 at PageID 214–15.) |
| (AMZ-WWC_00029677, Doc. 56-18.) | |



| Clint Eastwood as *Dirty Harry* | *Do You Feel Lucky* |

Does Amazon seriously think that Protect the Charms "supplants" or "supersedes" Notre Dame's Fighting Irish school spirit and Lucky Charms's cereal-selling? That Do You Feel Lucky has the same "expression, meaning or message" as hardboiled Dirty Harry gunning down a perp? More flabbergasting, Amazon contends it is "undisputed" that "Weekend Warrior admitted that Protect the Charms does not comment on the Notre Dame Mascot or the Lucky Charms cereal designs," citing the deposition of Dan Whelan for the point. ECF No. 72-1 ¶ 191. Here's what Dan actually says:

Q. And is—what's—is there any message here about the cereal Lucky Charms.

A. **I think it's just kind of a play on the cereal where, you know, he's always got kids coming after his Lucky Charms**. And I think it's—it was kind of humorous for me to kind of make, **you know, Lucky's typically**—I don't know if you've seen it, but he's pretty like, happy go lucky character. **Happy go lucky**. **But I've decided to make him more** of, like, **angry**, **ready to** maybe even potentially **fight some kids over his Lucky Charms in order to protect them**.

Q. Is there any message here about the Notre Dame—about the college Notre Dame?

A. Kind of same type of deal. More—more of a **poking fun at their "protect the house" slogan and their character of a leprechaun**. So I thought that **kind of**

**meshed well in order to kind of create a unique design that can kind of be—what's the word—St. Patrick's Day type style design**."

Q. And is the—are you trying to convey here that the Notre Dame mascot is bad somehow?

A. No, sir.

Q. Okay. Are you trying to convey that he's too aggressive?

A. No, I wouldn't say that he's too aggressive, but I think it's more of—like, I mean, I think you could see from his—I mean, like **a lot of mascots kind of have, like, an angry, like, take on, you know, I'm not going to be messed with type face. So I kind of thought it would be funny to put Lucky**—so, I wouldn't—I mean, I don't know if you would say the leprechaun in Notre Dame is angry or anything like that, but if that's what you're asking, but—if that would make him bad, then maybe, but I don't really think trying to say the leprechaun is bad or anything.

ECF No. 55-12 at 2849:16–2850:25 (emphasis added). Dan's testimony directly contradicts Amazon's "undisputed" fact; his works do not need to say Notre Dame or Lucky Charms is "bad" in order to be transformative. The same ridiculous argument pervades its analysis of all of the 21 WW Designs. Supposedly, it is also undisputed that "Weekend Warrior admitted that Do You Feel Lucky does not comment on the *Dirty Harry* movies." ECF No. 72-1 ¶ 197 (citing, *inter alia*, Dan Whelan's deposition (ECF No. 55-12) at 2828:23–2829:7. Once again, Amazon twists testimony into knots:

Q. Are you—does this comment on the Dirty Harry movies at all?

A. I think it—maybe not. I don't know if comment is the right word, but I would say it's kind of a funny, like—you know, I feel like most of the time leprechauns aren't necessarily angry, like, detective, you know, hard nose violent guys. So I thought it would be kind of funny to make a leprechaun [character] essentially that would be kind of in that position to go along with the 'do you feel lucky."

Q. Do you think you could have made the same joke if you made the leprechaun look less like Clint Eastwood?

A. So I personally think that this kind of achieved what I was going for best. I mean, I suppose you could, but I don't—I think this was the way to go and that was my kind of artistic vision on it. I kind of feel it was important to the design.

> Q. Why?
>
> A. Because I think it's—it adds more humor for the fact that I drew his face pretty funny and I think just kind of hammers home that it's from Dirty Harry and that it's a—it's a parody of it and, otherwise, you know, it might get lost on people."

ECF No. 55-12 at 2828:23–2829:21. Dan Whelan may not speak like Justice Souter, but they're saying the same thing: "Parody needs to mimic an original to make its point, and so has some claim to use the creation of its victim's (or collective victims') imagination." *Campbell* at 580–81. Because the parodic character of Protect the Charms and Do You Feel Lucky, like that of the other parodies in the 21 WW Designs discussed in more detail in WW's Response to Amazon's Appendix B, "may reasonably be perceived," Amazon's argument must die like a bad joke. *Id.* at 582.

Even the WW Designs that use more of the Other Works still fairly use them. Crucially, **hand-painted/drawn, exact replicas of original works have been held transformative by the Supreme Court**. *Google v. Oracle* noted, generally, that "an artistic painting might, for example, fall within the scope of fair use even though it precisely replicates a copyrighted advertising logo to make a comment about consumerism." 593 U.S. at 29.



*Warhol* dove deeper:

> "**The purpose of Campbell's logo is to advertise soup. Warhol's canvasses do not share that purpose. Rather, the *Soup Cans* series uses Campbell's copyrighted work for an artistic commentary on consumerism, a purpose that is orthogonal to advertising soup. The use therefore does not supersede the objects of the advertising logo.** The situation might be different if [Warhol] licensed Warhol's *Soup Cans* to a soup business to serve as its logo. That use would share much the same purpose of Campbell's logo, even though *Soup Cans* has some new meaning or message. This hypothetical, though fanciful, is parallel to the situation here. Both Goldsmith and [Warhol] sold images of Prince ([Warhol's copying Goldsmith's]) to magazines to illustrate stories about [Prince], which is the typical use made of Goldsmith's photographs. Moreover, a further justification for Warhol's use of Campbell's logo is apparent. His *Soup Cans* series targets the logo. That is, the original copyrighted work is, at least in part, the object of Warhol's commentary. It is the very nature of Campbell's copyrighted logo—well known to the public, designed to be reproduced, and a symbol of an everyday item for mass consumption—that enables the commentary. **Hence, the use of the copyrighted work not only serves a completely different purpose, to comment on consumerism rather than to advertise soup, it also 'conjures up' the original to 'shed light' on the work itself, not just the subject of the work**. (Citation omitted.) Here, by contrast, [Warhol's] use of Goldsmith's photograph does not target the photograph, nor has Warhol offered another compelling justification for the use."

*Warhol* at 539–40 (combined with n.15) (emphasis added).

WW does not sell beer, or t-shirts promoting specific beer brands. It does not sell tickets

to wrestling matches, or t-shirts promoting Hulk Hogan. Nor does it sell DVDs of *Dirty Harry*, subscriptions to HBO Max, or t-shirts advertising Warner Brothers' properties. Yet Amazon conflates the sale of any t-shirt in any way incorporating or impliedly referencing one of the Other Works with "sharing a purpose" with those works. Amazon claims that because WW uses the WW Designs to sell t-shirts and "many of the [Other Works] are used on t-shirts . . . Weekend Warrior's copyrights [and the Other Works] 'share substantially the same purpose.'" ECF No. 73 at PageID 7002–03 (citing *Warhol* at 526). This is a silly argument and a misleading interpretation of *Warhol*. The *Warhol* court affirmed the Second Circuit's holding that the first fair-use factor favored the photographer onto whose photo of Prince Andy Warhol slapped an orange filter to make "Orange Prince," which Warhol's holding company then licensed to magazines. *See generally Warhol*. But the court's analysis of the two photographs' shared purpose was highly specific: "The purpose of the image is substantially the same as that of Goldsmith's photograph. **Both are portraits of Prince used in magazines to illustrate stories about Prince. Such environments are not distinct and different.** [Warhol's] licensing of the Orange Prince image thus superseded the objects, *i.e.*, shared the objectives, of Goldsmith's photograph, even if the two were not perfect substitutes." *Id.* at 535–36 (cleaned up).

That Amazon managed to find a couple of the Other Works on t-shirts does not mean that the WW Designs share the same purpose as those t-shirts; that could be said of *any* shirt for sale. The factor depends on whether WW's use of the Other Works (if any) "supersedes the objectives" of the Other Works. Just as Warhol's *Soup Cans*—an exact replica painting of a Campbell's soup can—did not "share the purpose" of advertising soup, the WW Designs do not "share the purpose" of advertising the Other Works. *See Warhol* at 538–40.

Finally, just because the WW Designs have a commercial purpose does not mean that the

first factor favors Amazon. Indeed, "nearly all of the illustrative uses listed in the preamble paragraph of § 107, including news reporting, comment, criticism, teaching, scholarship, and research . . . are generally conducted for profit." *Cariou*, 714 F.3d at 708 (2d Cir. 2013) (citing *Campbell* at 584). "The commercial/nonprofit dichotomy concerns the unfairness that arises when a secondary user makes unauthorized use of copyrighted material to capture significant revenues as a direct consequence of copying the original work." *Id.* (citation omitted). "This factor must be applied with caution because, as the Supreme Court has recognized, Congress "could not have intended" a rule that commercial uses are presumptively unfair. *Id.* (citing *Campbell*, at 584). At bottom, "**[t]he more transformative the new work, the less will be the significance of other factors, like commercialism, that may weigh against a finding of fair use.**" *Campbell* at 579 (emphasis added). Amazon's throwaway "first factor against WW because designs sold on t-shirts" argument thus falls flat.

---

Dan Whelan does not compare himself to Andy Warhol, or Do You Feel Lucky to *Soup Cans*. Yet, legally speaking, the comparisons are apt. The key difference is that Dan's works use *less* of the originals than Warhol's magnum opus. Some of them twist multiple aspects of multiple different works into something completely, outrageously new, with an artistic message lightyears apart from the originals'. Others invoke just one work, but can "reasonably be perceived" as parodying that work. *Campbell* at 582. At bottom, regardless whether the 21 WW Designs are parodies or just bend any aspects of the Other Works in a new direction, they demonstrate ample transformative value that pushes this factor decisively in WW's favor. Because Amazon misreads and misapplies the law, pawns gross mischaracterizations off as "undisputed facts," and refuses to acknowledge obvious originality and transformativeness in the WW Designs, this factor favors

WW.

### (2) *Nature of the Copyrighted Work*

This factor "is not much help in this case." *Campbell* at 586. This is because "parodies almost invariably copy publicly known, expressive works." *Id.* And this factor is not much help for transformative works in general—besides just parodies—either. *See Bill Graham Archives v. Dorling Kindersley Ltd.*, 448 F.3d 605, 612–13 (2d Cir. 2006) (holding that even though defendant produced a book that featured exact copies of plaintiff's copyrighted photographs, "the second factor has limited weight . . . because the purpose of DK's use was to emphasize the images' historical rather than creative value." Because WW's works are transformative, this factor has limited weight.

### (3) *Amount and Substantiality of the Portion Used*

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole are reasonable in relation to the purpose of the copying." *Campbell* at 586 (cleaned up). The third, fourth, and first factors are related, as "the extent of permissible copying varies with the purpose and character of the use," and "[will reveal] the degree to which the parody may serve as a market substitute for the original or potentially licensed derivatives." *Id.* at 586–87. Importantly, in assessing this factor, **courts "must focus only on the protected elements of the original.**" *Leibovitz* at 115 (emphasis added). In the context of parodies, "the heart of a primary work is also what most readily conjures up the original for parody, and it is the heart at which parody takes aim," *Id.* at 116 (cleaned up and citing *Campbell* at 588). Thus, the third-factor inquiry in the parody context concerns "what else the parodist did besides go to the heart of the original." *Id.* (citing *Campbell* at 589).

*Leibovitz* and *Cariou* are instructive: *Leibovitz* found that defendant "went to great lengths

to have its ad [(naked Leslie Nielsen, *supra*) copy protectable aspects of the Leibovitz photograph [(naked Demi Moore, *supra*)]," copied protectable elements of naked Demi Moore "to an extreme degree," and "took more of naked Demi Moore than was necessary to conjure [her] up." *Id.* at 116. Still, this "extreme" copying did not weigh against naked Leslie Nielsen, as "the reasonableness of taking additional aspects of the original depends on the extent to which the overriding purpose and character of the copy is to parody the original, and the likelihood that the parody may serve as a market substitute for the original." *Id.* at 116 (cleaned up). *Cariou* reenforced that "**the law does not require that the secondary artist may take no more than is necessary**" because the "secondary use must be permitted to conjure up **at least enough of the original** to fulfill its transformative purpose." *Cariou* at 710 (finding as a matter of law that even though defendant "used key portions" of plaintiff's photographs in majority of his artworks, third factor weighed "heavily" in defendant's favor because he "transformed [plaintiff's works] into something new and different") (cleaned up).

Simply looking at the WW Designs reveals that when they borrow any protectable expression from the Other Works at all, they imbue what they borrow with substantial new creativity or a different message, and never serve as a "merely superseding use." *Campbell* at 588. In its opening brief, WW discussed what it believed Amazon would claim were the closest calls—I Want Brew and Enjoy Beer—to demonstrate why even those close calls demonstrate sufficient originality for protection. ECF No. 66 at 6860–61. WW incorporates that discussion by reference here, but demonstrates specifically why even on those works, factor three still favors WW.

| Uncle Sam with Beer | I Want Brew |
|---|---|
| | |



Amazon claims I Want Brew "recasts, adapts, and centers on the image of Uncle Same with a beer by depicting Uncle Sam in an identical outfit, identical posture, identical face, and holding a mug of beer with the same foamy head spilling slightly over the rim." ECF No. 72-1 ¶ 221. But the color of the beer is different, the foamy head is not the same, Uncle Sam is drawn in a different art style, the bowtie is crisper and bouncier, and Uncle Sam's collar is different. These differences are magnified by Dan's inclusion of stars, as well as a play on the classic "I Want You for the U.S. Army" slogan. Though both works are clearly inspired by the public-domain Uncle Sam poster, and both feature Uncle Sam holding a beer, that is where the similarities end.

| Coca-Cola Santa | Enjoy Beer |
|---|---|
| | |



Amazon claims it is undisputed that Enjoy Beer "uses an identical copy" and changed "only some of the colors" from Coca-Cola Santa. ECF No. 72-1 ¶ 169. Neither is true. Dan Whelan ran a "threshold" over a Coke Santa image (similar to creating a negative of a photograph), and then modified the remaining image with snowflakes, new writing, Christmas-centric shading, and, of course, beer. This is similar to the works found fair as a matter of law in *Cariou*, where defendant artist "incorporate[d] photographs that have been enlarged or tinted." *Cariou* at 700. "Make someone happy" is gone, as are the bow on the Coke, the bubbles emanating from the pop, and the Coke logo in the bottom right, all of which contribute to the original's identity as a Coke ad. Enjoy Beer does not supplant it because it is an obvious parody of Coke's wholesome holiday commercialism, replacing sugary, kid-friendly soda with beer.

As explained in more detail below, as well as in WW's Response to Amazon's Appendix B, which can be found at the end of this brief, if WW took any of the Other Works at all, it took a justifiable amount to make something completely different. This factor favors WW.

### (4) Effect on Potential Markets for or Values of the Other Works

This factor "requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in *a substantially adverse impact* on the potential market. *Campbell* at 590 (cleaned up and emphasis added). When a commercial use amounts to mere duplication of the entirety of an original, it clearly supersedes the objects, but **when**, on the contrary, **the second use is transformative, market substitution is at least less certain**, and market harm may not be so readily inferred. *Id.* at 591 (emphasis added). "Indeed, as to parody pure and simple, it is more likely that the new work will not affect the market for the original in a way cognizable under this factor." *Id.* (cleaned up); *see also Leibovitz* at 116–17

(finding that primary users are not entitled to licensing fees for works that otherwise qualify for the fair use defense as parodies). This is because "parody may not harm the market at all, but when a lethal parody, like a scathing theater review, kills demand for the original, it does not produce a harm cognizable under the Copyright Act." *Id.* at 591–92 (cleaned up). The fact that a parody may impair the market for derivative uses by the very effectiveness of its critical commentary is no more relevant under copyright than the like threat to the original market. *Id.* at 593.

As discussed above and below, the 21 WW Designs are clearly transformative, making market substitution less likely. In fact, Amazon's own aggressive tactics in discovery bolster WW's argument that none of the 21 WW Designs replace the markets for the Other Works. Amazon knew it faced an uphill battle of invalidating as many WW Designs as it could, lest it suffer the consequences of its blatant infringement. As part of a scorched-earth litigation strategy, Amazon subpoenaed 12 companies connected to the Other Works in the hopes that those companies would accuse WW of infringement. ECF No. 80-1 ¶ 3; ECF No. 80-4. Just weeks after receiving Amazon's subpoena, one company did,[3] and because WW did not wish to expend the significant resources required to defend against even meritless allegations, WW agreed to remove Fantasy Football Legend from its website. ECF 55-17 at PageID 3151:17–3152:17. No other company subpoenaed by Amazon took any action against WW in response to Amazon's subpoenas.[4] ECF No. 80-8 ¶ 3. Amazon here claims WW infringes the alleged rights of the WWE,

---

[3] On April 24, 2025, the law firm representing the IP holder of *Conan the Barbarian* sent WW a cease-and-desist letter accusing Fantasy Football Legend of infringing the movie poster for *Conan the Barbarian*. ECF No. 55-20 at PageID 3356. For reasons discussed in more detail below, the accusation is meritless.

[4] In July of 2024, WW also removed Bad Day to Beer *America Edition* and Ameri-CAN Eagle from its website after receiving a cease-and-desist letter in June 2024 from Anheuser-Busch alleging that the designs infringed a Budweiser can. ECF 55-19. Tim Whelan corresponded with an A-B representative over the phone and via email, cordially insisting that those WW Designs (footnote continued)

Heineken, Warner Brothers, the University of Notre Dame, Pabst Brewing Company, Coca-Cola Company, Corona, Boston Beers, and Molson Coors, when those companies themselves make no such allegations. ECF No. 80-8 ¶ 3.

Other than two cease-and-desist letters—both meritless, and one prompted directly by Amazon's subpoena—Amazon offers zero evidence of any threat of market substitution. This dearth is far from the "substantial adverse impact" required by *Campbell* (at 590). Nothing epitomizes the lack of potential market harm better than Amazon's rampant infringement of the WW Designs: When Amazon displayed exact copies of the WW Designs, did any of the brands WW allegedly ripped off try to remove those designs from Amazon, claiming infringement of their IP? Of course not.

The fourth factor favors WW. The Court should reject Amazon's self-serving campaign because it would "stifle the very creativity which [copyright] law is designed to foster." *Princeton Univ. Press.*, 99 F.3d at 1385.

**B.**     <u>The DMCA does not shield Amazon's infringement of any WW Design.</u>

    **1.**     **Amazon is not eligible for the DMCA defense because it failed to reasonably implement a repeat-infringer policy.**

Amazon buries the lede on the DMCA. Before addressing the individual elements of the affirmative defense—all of which Amazon must satisfy "beyond controversy" with undisputed evidence—it must first prove that it is eligible to invoke the defense in the first place. It is not.

The law sets the threshold for eligibility; Amazon must prove it "has adopted **and**

---

were clear parodies. *Id.*. A-B maintained that the WW Designs infringed the Budweiser can, but permitted WW to sell its inventory of the designs through the weekend before the Fourth of July. *Id.* For reasons discussed in more detail below, A-B's accusation (as well as Amazon's echoing of the same) was meritless.

**reasonably implemented** . . . a policy that provides for the termination in appropriate circumstances of subscribers and account holders of the service provider's system or network who are repeat infringers." 17 U.S.C. § 512(i)(1)(A). Amazon has a repeat infringer policy in theory, but the practice matters. The controlling question is whether Amazon "reasonably implements" its repeat infringer policy. Undisputed evidence establishes that Amazon fails to even implement its repeat infringer policy, let alone implement it "reasonably."

To "implement" a repeat infringer policy under Section 512(i), Amazon must have a **working notification system** and a procedure for dealing with **DMCA-compliant notices**. *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1109 (9th Cir. 2007) (emphasis added). To implement its policy "reasonably," Amazon must, under "appropriate circumstances," "terminate users who repeatedly or blatantly infringe copyright." *Id.* **If a service provider "*allow[s] notices of potential copyright infringement to fall into a vacuum and to go unheeded* . . . that fact is sufficient for a reasonable jury to conclude that [a service provider has] not reasonably implemented its policy against repeat infringers.**" *Ellison v. Robertson*, 357 F.3d 1072, 1080 (2004) (emphasis added).

Amazon did far worse than "allow" WW's notices of copyright infringement to go unheeded. After an ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████, until WW finally sued. ECF No. 66-1 ¶¶ 67–99). While it was ████████████████████████ ██████████████████████████████████████████████████████████████ ███████████████████████████████████████. *Id.*; ECF No. 64-14. None of these emails told Tim the real reason for the rejections—██████████████████████████████████

██████ ECF No. 66-1 ¶¶ 67–99.. They never told him because Amazon decided that ████████ ████████████████████████████████, to seek removal of that scarlet letter █ from their chest. ECF No. 66-1 ¶¶ 95–96.

Amazon made all of these devastating decisions despite the fact that WW's notices complied with the DMCA. Far from having a procedure that "dealt with DMCA-compliant notices," *Perfect 10* at 1109, Amazon rejected notices from WW that satisfied the statute. WW repeatedly identified the accused work (with specifically-identifying ASINs), the WW Design it infringed (with links to the product on WW's brand website), abundant contact information connecting the submitter to the brand, and the attestations of ownership and accuracy. 17 U.S.C. § 512(c)(3); ECF No. 66-1 ¶¶ 39–66. The purpose of Amazon's infringement-notice form is to ensure compliance, and whenever he submitted a notice, Tim filled out every required field. ECF No. 66-1 ¶¶ 46–66. When prompted for any clarifying followup, he provided it promptly. He thought he was doing everything right—and he was—Amazon just ████████████████ ██████.

Evidence produced by Amazon shows the natural consequences of this ████████ ██████—rampant repeat infringement. As just two examples, about a week before Amazon declared him ████, Tim sent Amazon a DMCA-compliant notice on March 14, 2022 about an exact copy of Bad Day to be a Beer on Amazon. ECF No. 53 Ex. B.24b (Case ID ending in ████). After Tim sent the notice, ████████████████████████████████████. ECF No. 53 Ex. B.19 Content Owner ID ████████ starting March 15, 2022. By the time Amazon terminated his Merch account, ████████████████████████████████████████ ████████████████████████. *See* Motion to Seal in Support of MSJ Opp., Ex. A at Content Owner ID ████████ & ECF No. 53 Ex. B.25 at same. The next day, Tim submitted

another DMCA-compliant notice about a different Merch creator selling a different exact copy of Bad Day to be a Beer. ECF No. 53 Ex. 24b at Case ID ending in ███. Amazon also rejected that notice, allowing the creator to generate ███████████████████████████████████ ████████████. ECF No. 53 Ex. B.19 at Content Owner ID ███████. Amazon also ████████████████████████████████████████. ECF No. 53 Ex. B.25. In fact, Amazon's document showing the Tiers of both terminated creators and those allowed to continue uploading designs to Merch for Amazon's profit reveals that Amazon ████████████. *See* ECF No. 53 Ex. B.25 (largest terminated Tier of █████ designs; largest non-terminated Tier of █████ designs). This means that by the time Amazon terminated an accused infringer, that accused infringer could offer █████ *unique designs* on Merch. That amount is up to Amazon's sole discretion. ECF No. 66-1 ¶ 7.

     Amazon ██████████████████████████████████████████████████████. Amazon pats itself on the back for supposedly springing into action *after* WW sued, when service of process confirmed Tim was ████ after all. Yet these infringers, and many more, went unpunished for ██████ even if they were punished, it wasn't because of any of Tim's notices, which were ███████████████████.

     The problem doesn't just affect WW, and the broader implications of Amazon's notice-and-takedown policies are relevant to entitlement to immunity. *See Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 614 (9th Cir. 2018) (while DMCA "subsection (c) . . . aims at individual infringements, not the service as a whole . . . **Congress promulgated subsection (i) . . . as "a prophylactic against future acts of infringement by actors whose past conduct renders them suspect"**) (emphasis added). Amazon claims that it only declares people who claim infringement "███████████████"—███████████████████████████████████



████████████████████████." ECF No. 66-1 ¶ 96. But we know that "████████" is a euphemism for shoddy investigations that caused an ████████ brand owner to have valid notices rejected for a year and a half. Given that Amazon claims to have "████████████████████████ ████[5]" (ECF No. 72-1 ¶ 45), its conclusory "████████" that "████████████████████████ ████████████████████████████████████████ ████████████████████████████████" (*id.* ¶ 46) raises red flags. If even 1% of those ████████ ████ notices are actually ████, and as valid as WW's, Amazon has admitted to ████████ ████████████████.

Amazon's authority does not save it. *Ventura* explicitly held that "participating in copyright infringement" and "refusing to terminate known repeat infringers" "cut against the service provider" in determining Section 512(i) eligibility. 885 F.3d at 617–18. Here, Amazon ████████ ████████████████████████████████████████████████████████ ████████ before and after it ████████████████," not only displaying the ignored infringements on its website on multiple different templates, but profiting off the sales. *See*, *e.g.*, ECF No. 53 Ex. B.24 (LaMagna 53) at ASIN ████████ (notified for removal multiple times by Tim); ECF No. 53 Ex. B.19 from Order IDs ending in ████ through ████ (months of discrete sales of infringements from same creator); ECF No. 53 Ex. B.25 (terminated at promoted Tier 100).

The DMCA promises expansive immunity for copyright infringement occurring on Amazon. In exchange for that promise, the statute requires Amazon to have a working notification system that deals with DMCA-compliant notices, and to reasonably implement a policy against

---

[5] This is a direct contradiction of Amazon's 30(b)(6) witness and notice and takedown manager, declarant Chad Bundy, who testified at deposition that "████████████████████████████ ████████████████████████████████" ECF No. 66-1 ¶ 85.

repeat infringers. *Perfect 10*, 488 F.3d at 1109. Instead, here, Amazon not only "allowed," but ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ WW's valid infringement notices to "fall into a vacuum and to go unheeded"—regardless of their content and what light they shed on repeat infringers. *Ellison*, 357 F.3d at 1072. The result of that purposeful choice was repeat infringement run amok. The Court should impose consequences for that result and reject Amazon's DMCA eligibility in this case as a matter of law.

> **2.    Even if Amazon is eligible under Section 512(i), it fails to establish Section 512(c) immunity as a matter of law.**

Safe harbor under Section 512(c), which Amazon can only invoke if it proves eligibility under Section 512(i) (it does not), is an affirmative defense. *See Canvasfish.Com, LLC v. Pixels.Com, LLC*, 2024 WL 885356, at *11 (W.D. Mich. Mar. 1, 2024) (citing *Atari Interactive v. Redbubble, Inc.*, 515 F. Supp. 3d 1089, 1113 (N.D. Cal. 2021) ("*Atari*"), *aff'd in part, appeal dismissed in part*, 2023 WL 4704891 (9th Cir. July 24, 2023). Because Section 512(c) safe harbor is an affirmative defense, Amazon "must establish beyond controversy *every* essential element or lose the protection." *Atari* at 1113–14 (quotes omitted and emphasis added). If Amazon establishes the defense, it remains liable for any proven infringement, but WW can only obtain limited injunctive relief. *Id.* If Amazon cannot establish even one of these elements, Section 512(c) affords no safe harbor.

The Court should reject Amazon's Section 512(c) defense as to the Unsold Listings for three reasons: (1) the images on Merch are not stored "at the direction of the user;" (2) Amazon had red-flag knowledge of infringement of the Unsold Listings and did not expeditiously remove them; (3) Amazon had the right and ability to control the infringement on Merch and benefitted financially from the infringement of the Unsold Listings.

a. **The images on Merch are not stored at the direction of the user.**

Infringing material is stored "at the direction of the user **if the service provider played no role in making the infringing material accessible on its site**." *Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1056 (9th Cir. 2017) (emphasis added). Amazon plays an active role in making infringing material accessible by selecting the product templates on which creators can place designs (ECF No. 66-1 ¶ 9), generating images of the designs on those different templates (*id.*), retaining final say over the ██████████████████ of any product sold (ECF No. 66-1 ¶ 23), manufacturing and handling all customer service and returns for any products sold (*id.* ¶ 21), ████████████████████ (ECF No. 66-1 ¶¶ 1–8), and ██████████████ ██████████████████████████████████████ (ECF No. 72-1 ¶ 14); ECF No. 53 Ex. A.8 at 45:25–64:10.

*Atari* is directly on point. There, the court held that Redbubble, a print-on-demand company that Amazon considers an "████████" (ECF No. 53 Ex. A.13 ¶ 28), was not entitled to Section 512(c) protection as a matter of law on summary judgment. *Atari* at 1114. Amazon's retained witness, Richard LaMagna, explains ████████████████████ ██████████. *See generally* ECF No. 53 Ex. A.13). *Atari* held, as a matter of law on summary judgment, that the images Redbubble's users uploaded to Redbubble were not stored at the direction of the user, rendering the DMCA defense unavailable. The court "applied the principles" of the authorities Amazon cites in its argument—*Ventura* and *UMG Recordings*—and rejected Amazon's argument for reasons directly applicable here:

> Applying the principles set forth in *Ventura Content*, *Mavrix*, and *UMG Recordings*, however, the Court concludes that Redbubble fails to satisfy this element. The images on its website are not stored "at the direction of the user" **because Redbubble actively participates in modifying the files uploaded by users to display the designs on Redbubble-selected physical products**. *See Mavrix*, 873 F.3d at 1055 (requiring defendant to "play[ ] no role" in making the

infringing material accessible beyond narrow access-facilitating conduct). Thus, Redbubble is not entitled to the safe harbor protections of 17 U.S.C. § 512(c).

*Atari* at 1114 (N.D. Cal. 2021).[6] Merch works in the exact same way. Amazon "actively participates in modifying the files uploaded by users to display the designs on [Amazon]-selected physical products," like t-shirts, tumblers, and tote bags. That not all displayed products in *Atari* resulted in sales was of no event, meaning Amazon's argument that the DMCA immunizes it for "user-uploaded designs that were displayed but never made or sold" (MSJ at 41) (ECF No. 72 PageID 7006) is wrong.

> **b.      Amazon had red-flag knowledge of the Unsold Listings and did**
>
> **not expeditiously remove them.**

"Actual knowledge refers to whether the service provider had subjective knowledge, while **red-flag knowledge turns on whether a reasonable person would objectively know of the infringements.**" *Mavrix Photographs*, 873 F.3d at 1057 (emphasis added). The reasonable person to whom infringement must be obvious is an ordinary person—not endowed with specialized knowledge or expertise concerning the laws of copyright. *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 93–94 (2d Cir. 2016). Amazon cannot dispute that it had actual knowledge of every WW Design as soon as those designs were included in either the Complaint or First Amended Complaint. But Amazon also had red-flag knowledge of not just every WW Design about which WW submitted a notice prior to suing, but every WW Design in the USA Drinking Team website

---

[6] *Atari* also emphasizes that two prior decisions applying DMCA immunity to Amazon "do not even discuss the 'by reason of storage' element." *Atari* at 1114 (distinguishing *Milo & Gabby, LLC v. Amazon.com, Inc.*, 2015 WL 4394673 (W.D. Wash. July 16, 2015) & *Corbis Corp v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1100 (W.D. Wash. 2004)). Neither of those cases discusses Merch, where it is undisputed that Amazon is the seller of record for, decides which product templates on offer for, controls the final price and royalty distribution for, and handles all shipping, customer service, and returns for, the designs uploaded by creators, who Amazon vets at every stage.

t-shirt catalogue.

A reasonable person could see from Tim's earliest notices what WW owned and why Amazon infringed it. From the very first notices he submitted, Tim Whelan identified himself as the "owner of OfficialUsaDrinkingTeam.com," and his company as "USA Drinking Team (Weekend Warrior LLC)." ECF No. 53 Ex. B.24. He provided links to the designs WW alleged to be infringed, and the Amazon links infringing them, at every turn. It is reasonably obvious to someone reading his notices that he owned not just the particular image alleged to be infringed, but all of the images on WW's website. And unlike in cases about complicated videos, where determining the scope of the copyright is highly complex and the claimants did not provide clarity, WW made abundantly clear from the beginning that its copyrights resided in simple, two-dimensional designs, which Amazon was copying down to the pixel.

Tim even specifically provided a link to the page hosting WW's entire t-shirt catalogue in May of 2022. Along with the link to the site where all of the WW Designs are available, Tim's notice targeted a specific creator,[7] stating "This is a pop-up seller **using our copyrighted material** to poach customers from our thousands of dollars of daily ad spend on digital marketing. If this is not taken down as part of DMCA policy, we will be forced to escalate." ECF No. 53 Ex. 24b at Case ID ending in 1071.

All one who reads that notice has to do is click Tim's link; all of WW's publicly-viewable copyrighted designs are visible on that page. Since Amazon fancies itself a modern day print shop, the Court should treat it like one. If a local artist brought the print shop owner a list of his drawings and said, "please stop printing these; I'm getting ripped off by the thousands because your personal

---

[7] And not just any creator, but a shameless repeat-infringer: This Amazon Mercher sold ███████ ███████████ for Amazon, from ██████████████████████. Laiolo Decl. Ex. B.19 at Content Owner ID ███████.

designers are printing them all over town" it is not objectively reasonable as a matter of law for the store owner to ignore the request and say, "I have no idea what you're talking about; you're ███," and continue to not only print them, but to post them up on the store's walls, manufacture them into products, ship them en masse, and call himself the seller of record, all while claiming total innocence.

If anyone was capable of taking note that the designs on USA Drinking Team's t-shirt page were copyrighted and being sold by Amazon without permission, it was Amazon. The company ████████████████████████████████████████████████████████ ██████████████████████████, but ████████████████████████████████ ████████████. ECF No. 53 Ex. A.8 (Morgan Snyder) at 45:25–64:10; ECF No. 72-1 § I.A. Tim's notices gave Amazon the information necessary to do just that; it just ██████████████████ ████████████. And if the technology worked, then WW's filing of the Complaint and First Amended Complaint, which included high-quality images of the WW Designs, should have allowed Amazon to prevent *any* exact copies from ever being created, and affixing those copies to various articles to entice customers (creating derivative works), let alone remaining on the site for any number of days. Amazon cites no authority holding as a matter of law that infringing copyrights for 14 days or shorter after a lawsuit is filed entitles it to DMCA immunity.

**(1) Amazon had the right and ability to control the infringement and benefitted financially from the Unsold Listings.**

Another way to show the right and ability to control that Amazon does not mention is through "purposeful conduct," including evidence of inducement. *Columbia Pics. Indus., Inc. v. Fung*, 710 F.3d 1020, 1045–46 (9th Cir. 2013). Amazon cabins its argument for immunity only in the Unsold Listings, but even for those, a reasonable jury could find Amazon induced

infringement, both as to all of Merch generally, and WW, specifically.

Amazon knows that Merch contains substantial amounts of infringement. By its own estimation, ████████████████████████████████████████████. *Cf.* ECF No. 72-1 ¶ 46).[8] Given that Chad Bundy, Amazon's Notice & Takedown manager, testified that Amazon ██████████████████████████████. ECF No. 66-1 ¶ 85), Amazon is comfortable operating a business that receives ████████████████████████████████████████. And discrete notices can include up to 50 allegedly-infringing ASINs per notice. ECF No. 57-13 at 5996. Merch hosts ██████████████████████. ECF No. 72-1 ¶ 34). The company is comfortable running a business where ███████████████████████████████████████████████ ██████████████, by its own admission.

There are numerous preventative steps that Amazon could take to reduce this theft, but purposefully chooses not to. It could reduce the number of discrete designs it permits creators to upload to Merch (currently ███████████ (ECF No. 66-1 ¶ 10), with the highest-approved accused-infringer of a WW Design being permitted to offer ████████, and the highest-terminated accused-infringer being permitted to offer ███████ (discussed *supra*). There is a ██████████, but it's massive: once users hit a certain tier, they can upload ████████████████. Snyder (ECF No. 53 Ex. A.8) at 65:12–66:12. How many legitimate artists, and not copycats, can work at such a rapid clip?

For one of the most powerful corporations in history, Amazon expends miniscule effort to police infringement before offering it for sale. As to designs it knows it cannot sell, either because they have been included in a "valid" notice or because Amazon knows they are IP-protected for

---

[8] Amazon's estimation that ████████████████████████████ is, of course, purely speculative. Tim Whelan shows one example of just how faulty that assessment could be.

another reason, Amazon ███████████████████████. ECF No. 53 Ex. A.8 at 21:14–17. It uses this ████████████████████████████████████. *Id.* at 46:5–48:7. Prior to upload, creators must provide Amazon with an image of their design, its title, and its "brand name," so ███████████████████████████████████ ███████████████████. ECF No. 66-1 ¶ 11). Amazon could ████████████ █████████████████████████████████████████████████████ ████████████████████████████████. ECF No. 53 Ex. A.8 at 22:3–17; ECF No. 53 Ex. A.12 (LaMagna) at 168:21–169:16 ). But instead, Amazon ████████ ████████████████████████████████. ECF No. 53 Ex. A.8 at 45:25–64:10. Once Amazon ████████████████—and uploads the design on all its potential products (selected by Amazon) are viewable and buyable on Merch, with Amazon as the seller of record (ECF No. 66-1 ¶¶ 9, 24)—Amazon ██████████████████████ █████████████████████████████████████████████████. ECF No. 72-1 ¶ 30); ECF No. 53 Ex. A.8 at 45:25–47:9, 47:25–48:4.



> Q.   So any content that is flagged as potentially infringing something in the image library . . . that Amazon has, does there have to be a human review before the content is removed?
>
> A. **Merch's image detection tools flag content for manual review for human review. They right now are not automatically removing or blocking content** . . .
>
> Q. So brand partner or not brand partner. When a new listing is created on Merch, Amazon's image detection technology does not prevent the creation of that listing on Merch; right?
>
> A. **Merch's image detection technology does not prevent the initial publishing of an image**.

ECF No. 53 Ex. A.8 at 47:25–48:4, 48:20–49:1 (emphasis added). Amazon's ██████████ ████████████████████████████████████████████████████████

██████. *See id.* at 51:10–52:4 (Amazon's flagging tech could "█████████ ███████████████████████;" if it was looking for Disney's lovably chaotic alien, Stitch, of *Lilo & Stitch*, for example, "it █████████████████████████████████ █████"). This technology has been harnessed by Amazon for "██████," just not before it displays designs and offers to sell them to the public. *Id.* at Snyder at 52:21–53:1.

That ████████—of published designs that *Amazon knows it is not permitted to sell*— is ██████████. Unlike the team of "████████████████████████████" who ████████ ████████████████████████████████████████████) (ECF No. 66-1 ¶ 94), the team that reviews flagged, published designs is under the gun. It's a lean team. Amazon's Content Operations Program Manager, Morgan Snyder, leads ████████████████████████████ ████████████████████████████████████████████████████ ████████████████. ECF No. 53 Ex. A.8. Out of those ████████████████████████ ████████████████████████████████████████████████████ ██████. *Id.* 57:16–64:10. Even one "████████████████" can take *up to four hours*. *Id.* This understaffing, and refusal to ████████████████████, are "purposeful" choices that "induce" increased infringement on Merch. *See Fung*, 710 F.3d 1020, 1045–46 (9th Cir. 2013).

Even if they did not result in sales, Amazon still reaps a direct financial benefit from constricting its policing of cheap knockoffs on Merch. Tim Whelan repeatedly informed them of all the ways Amazon's infringements harmed WW. *See generally* ECF No. 53 Ex. B.24 (LaMagna 53). That harm is clear. *See* ECF No. 80-8 Ex. E-1:



Comments like these on WW's ads and on Amazon reviews of infringements of its products dilute the value of the copyrights in the WW Designs and prevent WW's growth as a company, to Amazon's benefit. ECF No. 80-8 ¶ 4. Even Unsold Listings can cause lost customers to WW and gained customers for Amazon, and loss of goodwill to WW and increased goodwill to Amazon.

ECF No. 53 Ex. A.1 (Hanson Rep.) § III.C.

For all of the reasons stated above, the Court should reject Amazon's bid for DMCA immunity.

### C. Amazon's Attorneys' Fees Argument is Premature

"In federal court, issues of attorney's fees are collateral to the merits of the case." *Morgan v. Union Metal Mfg.*, 757 F.2d 792, 795 (6th Cir. 1985). Because attorneys' fees are collateral to the merits of the case, common sense and the Copyright Act's need to identify a prevailing party dictates that issues of attorneys' fees be resolved after the merits.

Courts in this district regularly decide fees issues at the conclusion of the merits. *See, e.g., Int'l Bhd. of Elec. Workers Loc. Union No. 212, AFL-CIO, CLC v. Tri-M Grp., LLC*, 2006 WL 8443075 at *2 (S.D. Ohio Nov. 15, 2006) ("it has always been the practice of this court to address attorney's fees at the conclusion of the merits"). *Sutherland v. Michigan Dep't of Treasury*, 220 F. Supp. 2d 815, 823 (E.D. Mich. 2001) (explaining, while considering summary judgment motions, that "Plaintiffs' motion for an interim award of attorney fees is premature. There is no indication that plaintiffs are, or ultimately will be, the prevailing party in the case"); *see also Soloski v. Adams*, 600 F. Supp. 2d 1276, 1372 (N.D. Ga. 2009) ("An award of attorney's fees is not appropriate at the summary judgment stage, as a request for attorney's fees is not a cause of action").

This case involves a considerable number of copyrights, some of which are eligible for statutory damages while others are not. Amazon is seeking to invalidate 21 of them, and both parties are seeking summary judgment in favor of or against infringement of all of them. It is unknown who will prevail and to what extent. Both parties have also expended significant resources toward their litigation efforts, and the Court and counsel have no information before

them about the attorneys' proposed rates or hours expended. Most crucially missing is any attorney's breakdown of their time. Decisions on if and how to award fees should receive the benefit of all of that evidence, and of full briefing on the issues. The Court should reserve issuing any fees ruling.

### D.    <u>The Court should not grant partial summary judgment as to the Five Copyrights identified by Amazon</u>.

#### 1.    **Amazon had fair notice of King of the Kill and St. PatRizz Day.**

Regarding King of the Kill and Happy St. PatRizz Day (now formally registered as St. PatRizz Day), throughout this case, WW treated these works like all the other WW Designs in the First Amended Complaint. Because the parties have tried copyright claims regarding King of the Kill and St. PatRizz Day by implied consent, WW respectfully moves to treat those claims as if raised in the pleadings under Federal Rule of Civil Procedure 15(b)(2).

The first Rule of Federal Civil Procedure stresses that the Rules should be "construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding." Fed. R. Civ. P. 1. This aim manifests here, where WW seeks to efficiently try all the claims set out in the First Amended Complaint—and about which extensive discovery has been taken—in the same case.

Rule 15(b)(2) permits this. "When an issue not raised by the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings. A party may move—**at any time, even after judgment**—to amend the pleadings to conform them to the evidence and to raise an unpleaded issue. Fed. R. Civ. P. 15(b)(2) (emphasis added). The goal of the Rule 15(b) "is to promote the objective of deciding cases on the merits rather than on the relative pleading skills of counsel," and "amendments under the Rule are to be liberally granted

where necessary to bring about the furtherance of justice and where the adverse party will not be prejudiced." *Am. Fam. Mut. Ins. Co. v. Hollander*, 705 F.3d 339, 348 (8th Cir. 2013) (cleaned up). Implied consent exists where a party has "actual notice of an unpleaded issue and has been given an adequate opportunity to cure any surprise resulting from the change in the pleadings." *Id.*

WW pursued claims for infringement of King of the Kill and St. PatRizz Day in discovery. It named King of the Kill and (then Happy) St. PatRizz Day in its First Amended Complaint filed in February, 2024, providing high-quality images of the designs in Exhibit A thereto. *See* ECF No. 17 at PageID 242–243. At the time, the works were still pending registration with the Copyright Office, so WW could not have sued for infringement of them. *See Reed Elsevier, Inc. v. Muchnik*, 559 U.S. 154, 157 (2010) (registration requirement is a precondition to filing a claim). WW produced the registration of St. PatRizz Day with its first production on November 11, 2024. ECF No. 80-1 ¶ 4 & ECF No. 80-4. WW produced the registration for King of the Kill on August 6, 2025, after the Copyright Office issued its registration on July 21, 2025. ECF No. 80-1 ¶ 5 & ECF No. 80-5.

On May 7, 2025, the Court ordered WW to supplement interrogatory responses "for each assertedly copyrighted work," and to "produce, for the Court's own examination, a document containing images of each allegedly infringing design . . . on Amazon, grouped by (and side-by-side with images of) the work they allegedly infringe." ECF Minute Entry at 05/07/2025. The primary purpose in Amazon seeking this discovery was to prepare for depositions of WW's founders regarding the creative process behind each at-issue WW Design and to clarify the scope of WW's copyrights. ECF No. 80-1 ¶ 6. WW complied with the Court's order, identifying Amazon's exact copies of these designs, and explaining Dan Whelan's process for creating them. *See* ECF No. 33-1 at, *inter alia*, PageID 1861; ECF No. 33-2 at, *inter alia*, PageID 1923; ECF No.

59-1 at PageID 6219–20, 6251.

Amazon cannot claim unfair surprise. Amazon produced sales figures and images showing allegedly infringing ASINs of these designs on Amazon. ECF No. 57-20 at PageID 6056 (sealed version of Laiolo Decl. in Support of WW's MSJ Ex. A-19); ECF No. 80-1 ¶ 7. Despite having two days on the record with each Whelan brother—one each in their individual capacities and in their capacities as a Rule 30(b)(6) witness—all lasting most of the day, Amazon's counsel did not ask a single question about either of these designs with the exception of a few about material excluded from King of the Kill's copyright registration. *Id.* ¶ 8. They also instructed their retained witnesses, Caroline de Baere and Doug Bania, not to analyze those designs. *See* ECF No. 57-4 at PageID 4284 n.1; ECF No. 76-3 at 8563 n.10.

Whatever prejudice Amazon will allege on reply is entirely of its own making. The company had "actual notice of an unpleaded issue" and ample "opportunity to cure any surprise resulting from the change in the pleadings." *Hollander*, 705 F.3d at 348 (8th Cir. 2013). Plaintiff respectfully requests the Court treat St. PatRizz Day and King of the Kill as part of this case, as they have been from the filing of the First Amended Complaint, and grant Plaintiff's Rule 15(b)(2) request.

### 2. The Beleaguered Livers and the Ameri-CAN who got Away

On May 16, 2024, WW's counsel emailed Amazon's counsel, informing them that a new WW Design, "Down Goes Liver," registration for which WW had applied to the Copyright Office, and requested that Amazon add it to the list of WW Designs for which Amazon has stated it will monitor infringement since two weeks after WW filed suit. ECF No. 72-1 ¶ 90; ECF No. 80-1 ¶ 9. WW's counsel attached a high-quality image of the design, noting that a DMCA takedown request sent to Amazon by WW had been faultily rejected by Amazon. ECF No. 80-1 ¶ 9 & 80-6.

Subsequently, Amazon began producing to WW images flagged by its image detection software as potentially infringing WW's Down Goes Liver. ECF No. 80-1 ¶ 10. Amazon also included with these productions various sales reports showing sales of those flagged images. *Id.* When WW was combing through its own documents and those produced by Amazon to compile the list of allegedly-infringing ASINs side-by-side with their respective WW Designs, WW counsel made the mistake of mixing up Down Goes Liver—which was not mentioned in the operative complaint—with Shut Up Liver, which was.

 

WW's counsel regrets the error, and WW does not currently assert claims for infringement of Down Goes Liver herein. WW retains its claim, however, for infringement of Shut Up Liver. Despite the mix-up, Amazon has been on reasonable notice of its infringement of Shut Up Liver since its inclusion in the First amended Complaint in February 2024. In one of its earliest formal productions on September 9, 2024, Amazon produced numerous images of clear knockoffs of Shut Up Liver that it offered for sale, including one that remained after the filing of the First Amended Complaint. ECF No. 80-1 ¶ 12 & 80-7.



Consistent with its reservation of the right "to allege infringement regarding additional ASINs that may populate or be discovered on Amazon subsequent to the filing of [its list of allegedly-infringing ASINs], up to and including trial," ECF No. 33 at PageID 1445, Plaintiff respectfully requests to amend its list of allegedly infringing ASINs to add the following Shut Up Liver knockoffs for sale by Amazon, images of which are included as D-6 to the Laiolo Decl. (ECF No. 80-7) in support of this Opposition: B0CW6L7P8K; B0CW328RW9; B0CW2T791B; B0CW25WBRD; B0CW2SQS3Q; B0CW2SF2FX; B0CW2RV4MT; B0CW2RV1JW; B0CW2RJJ816; B0CW2HSSJX; B0CW2HRDKB.

WW similarly reserves the right to amend its accused-ASIN list upon discovery of any Amazon products that infringe Ameri-CAN V2. WW respectfully requests that, should summary

judgment be granted in Amazon's favor on this design, Amazon nonetheless continue to monitor its site for infringement thereof. If it does not, Tim Whelan would have to place his trust in Amazon's notice-and-takedown system. That system has failed him time and again, including in the middle of this lawsuit. As Amazon has testified that ████████████████████████ ████████████████████ (ECF No. 66-1 ¶ 104), WW's counsel hopes it does not happen for a third time.

### E.     Amazon willfully infringed the WW Designs.

Amazon was not just willfully blind in systematically refusing to act on WW's valid infringement notices; it was willfully dishonest. Amazon had a very specific reason for selling thousands of WW Design knockoffs despite Tim Whelan's demands that it stop: It intentionally chose to program him and his company as "████." ECF No. 66-1 ¶ 69 ). But it never told WW the truth. *See* ECF No. 64-14; ECF No. 66-1 ¶ 99. It responded to Tim as if it was meaningfully considering his notices, but it ████████████████: ████████████████████ ████████████████████████████████████████ ████████████████████████████████████████ ██████. *See* ECF No. 64-14; ECF No. 66-1 ¶ 68–99.

Tim's only hope to reverse Amazon's decision—since Amazon gives ████ like Tim no opportunity to appeal—was a lawsuit. And in the middle of that lawsuit, Amazon did the same thing again, declaring him ████ once more, for nearly half of a year. ECF No. 66-1 ¶¶ 98–103, 105). All the while, Amazon's display, creation of derivative works of, and reproduction of knockoffs through Amazon's wholly-controlled distribution network continued apace. ECF No. 66-1 ¶ 108–10. This set of facts establishes Amazon's willfulness as a matter of law. *See Sony/ATV Music Publ'g LLC v. 1729172 Ontario, Inc.*, 2018 WL 4007537 (M.D. Tenn. Aug. 20, 2018)

("willfulness includes reckless behavior or willful blindness"); *Ducks Unlimited, Inc. v. Boondux LLC*, 2017 WL 3579215, at \*40 (W.D. Tenn. Aug. 18, 2017) ("**Examples of reckless disregard that rise to the level of willfulness include . . . repeatedly ignoring warnings from a copyright holder that defendant's behavior violates copyright law**") (emphasis added).

There is also ample evidence of willfulness for the infringement of the 24 copyrights for which WW did not submit a notice of infringement prior to filing suit. Most directly, infringement of these designs—either through Amazon's manufacture, sale, and distribution of the shirts on articles it provides through its shipping network, or through the creation of derivative works displayed on Merch under Amazon's control—continued after WW filed both the Complaint and First Amended Complaint. ECF No. 66-1 ¶¶ 9, 11, 14–25, 106–111; ECF No. 72-1 ¶¶ 86–87, 91–94. But Amazon knew and acted in reckless disregard of *all* of WW's copyrights long before WW ever sued.

"Evidence that notice had been accorded to the alleged infringer before the specific acts found to have constituted infringement occurred is perhaps the most persuasive evidence of willfulness." *Wildlife Exp. Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 512 (7th Cir. 1994) ("*Wildlife*"). "A **letter informing defendant of *possible* infringement** clearly provides notice." *Id.*; *see also Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.*, 106 F.3d 284, 293-4 (9th Cir. 1997), *rev'd on statutory damages grounds sub nom.*, *Feltner v. Columbia Pictures Television, Inc.*, 523 U.S. 340 (1998) (affirming district court's willfulness finding when 415 "infringing works" were "broadcast after the complaint in this action was filed"); *H-D U.S.A., LLC v. SunFrog, LLC*, 311 F. Supp. 3d 1000, 1039–41 (E.D. Wisc.) (willful infringement for failing to stop repeat infringers despite knowing their identities as a result of numerous takedown notices, even when SunFrog removed the products subject to the notices, because "identical or similar

designs popped up again just as quickly, often by the same designers or sellers" and "the removal process frequently took days, despite plaintiff providing direct links to the offending pages;" and noting that even though plaintiff's notices were not literally ignored, "SunFrog failed time and again to develop reforms to its practices that actually addressed the problem in a meaningful way") (cleaned up).

In *Wildlife*, the Seventh Circuit affirmed a finding of willful infringement where defendant received notice that one of its duffle bags violated a single copyright owned by plaintiff. *Id.* at 512. The next month, the notice was retracted because plaintiff failed to contest defendant's shipment of the bag as violative of copyright. *Id.* Despite the *retracted* notice, the lower court held, and the Seventh Circuit affirmed, that "defendant's failure . . . **to inquire after *other [plaintiff] copyrights* that *might* cover *[other plaintiff IP]* was *reckless indifference*.**" *Id.* Awarding enhanced statutory damages, the Seventh Circuit also sustained the following finding:

> "Defendant's agent's testimony was that they routinely did not check the proprietary status of merchandise purchased abroad, for reasons of cost, unless a recognized symbol like Mickey Mouse or Garfield Cat was involved. **Thus, defendant accepted the risk of infringements of unexamined and undiscovered copyrights.** When Customs detained panda shipments on the basis of plaintiff's copyright, and defendant learned of plaintiff's existence, plaintiff's counsel's existence, and plaintiff's business, it was no longer reasonable to sit back secure in its belief that its panda did not infringe plaintiff's panda. Nor did [the agent's] words of amazement without proof of independent origin or offer of indemnity take defendant out of a position of reckless disregard of plaintiff's *possible copyrights*. Defendant's failure to conduct a check of what copyrights plaintiff had registered, at this point . . . was an act of reckless disregard under the totality of the circumstances. Defendant's continued sales after plaintiff's demand letter . . . and after suit was filed . . . **are clear instances of willful infringement**."

*Id.* at 512–513 (emphasis added). Considering "whether the cancellation of the Customs notice relieved [defendant] of its **duty to investigate further the possibility of copyright infringement,**" the Seventh Circuit sustained the district court's "fault[ing] the defendant for failing to inquire about other [plaintiff] copyrights once the original notice appeared"—the notice

that was *retracted. Id.* at 513.

Recall that Tim Whelan provided Amazon with a link to WW's entire catalogue of copyrighted t-shirt designs, targeting a particular ASIN and a rampant repeat infringer, and saying, "This is a pop-up seller **using our copyrighted material** to poach customers from our thousands of dollars of daily ad spend on digital marketing. If this is not taken down as part of DMCA policy, we will be forced to escalate." ECF No. 53 Ex. B.24 at CaseID ending in 1071. Unlike the single, retracted notice in *Wildlife*, Tim Whelan sent Amazon a bevy of notices complaining of specific and wide-ranging infringement of WW's IP. Its investigators ███████████████████████ ███████████████████████████████. Its conduct is far more culpable than the defendant's in *Wildlife*, and should be adjudged accordingly.

Just as Amazon obscures the heart of the matter from Tim and Dan Whelan, it obscures key facts of *Michael Grecco Prods., Inc. v. Fandom, Inc.* ("*Grecco*"), 2025 WL 1675668 (C.D. Cal. May 9, 2025). It claims that case supports the proposition that "since the undisputed facts show Amazon did not review the notices, it lacked actual pre-suit knowledge." Amazon's MSJ at 55. This is the case, Amazon asserts, because *Grecco* "filtered all 30 pre-suit notices as part of a spam attack prevention effort and therefore did not review notices." *Id.* But in *Grecco*, the auto-replies received by plaintiff when it submitted notices included *verification requests that the submitter intentionally avoided*—unlike Tim Whelan, who followed Amazon's verification instructions to the letter. *Compare Grecco* at *1–2, *with* ECF No. 66-1 ¶¶ 54–56). Other damning distinctions are that plaintiff and defendant in *Grecco* "were also in direct and frequent contact during [the] same time frame [as when Grecco's notices were being filtered out]," and that "there [was] no evidence that anyone at Fandom reviewed, or otherwise knew about, the [notices]." *Grecco* at *2. For WW, ███████████████████████████████████████████

█████████████████████████████████████. ECF No. 66-1 ¶¶ 68, 100) .[9] If *Grecco* is the closest Amazon can get to no willfulness as a matter of law, it is far from the finish line.

Back-patting evidence about Amazon's generalized creator-vetting and notice-and-takedown procedures do not militate otherwise. Given that ████████████████████ ████████████████████████████████████████, its creators' promises that they own the designs they upload are unreliable. ECF No. 72-1 ¶¶ 45–46; ECF No. 66-1 ¶ 85). Nor is *Zillow* persuasive, because there, "Zillow immediately requested information to confirm [plaintiff's] copyright ownership and cross-reference the photos with licensing information," with which "[plaintiff] was not forthcoming." *Id.* at 749. Tim Whelan was highly forthcoming.

The last lines of defense are the "█████████████████" and Amazon's ████████ ███████████████████████████████████████. But the army of investigations didn't march for Tim Whelan. Only "████████████████████████████ does Amazon ███████████████, and only if █████████████████████" does Amazon ████████████ ████████████████████. ECF No. 72-1 ¶¶ 58– 60. That never happened for Tim; even

---

[9] Amazon's other authorities support WW. *See, e.g.*, *Bridgeport Music, Inc. v. UMG Recordings, Inc.*, 585 F.3d 267, 279 (6th Cir. 2009) (*affirming* willfulness because "UMG and its predecessors failed to respond to Bridgeport after receiving letters notifying them of possible infringement" and because there was "no evidence UMG made an effort to compare the two songs"); *Philpot v. LM Comms II of South Carolina*, 343 F. Supp. 3d 694, 701 (E.D. Ky. 2018) (no willfulness because "willfulness may be inferred from a defendant's conduct, but typically only when the facts suggest that the infringers had been placed on notice by the copyright holder and had ample time to ameliorate the infringing acts *prior to litigation*"); *SA Mucis LLC v. Apple, Inc.*, 592 F. Supp. 3d 869, 882 (N.D. Cal.) (plaintiff never sent a single notice of claimed infringement); *King Recs., Inc. v. Bennett*, 438 F. Supp. 2d 812, 861–62 (M.D. Tenn. 2006) (noting plaintiff failed to provide defendant with "any specific titles that he believed were being infringed," "the quality of plaintiff's notice was so poor that defendant could not know which of plaintiff's titles he was allegedly infringing," and there was "absolutely no notice—not even vague notice—from plaintiff that the other sound recordings were being infringed")

though his notices *were* valid, Amazon ████████████████. As for the actual fraudsters, Amazon brags that it "████████████████████████████████████████

████." ECF No. 72 at PageID 7023. It cites a ████████████████████████████

████. You might be tempted to think, "good job!", but you shouldn't. Open ECF No. 53 Ex. B.23 and compare the information submitted by Tim Whelan in Columns G–J with the information submitted by the fraudsters in the same columns. Notice that Tim Whelan always includes a contact brand of either WW, USA Drinking Team, or both, and that he always speaks in complete, explanatory sentences. Contrast that with the fraudsters, who offer less clarity, such as "a██

████████████████████████████" and ████████████████████████████.

Amazon treated these individuals the same way they treated Tim Whelan, but the quality of their form notices could not be farther apart. The investigators who decide who's ███ and who's ███ wield enormous power. Their decisions can break businesses. They broke the Whelans', and Amazon still refuses to tell them why, or admit it did anything wrong. It willfully infringed the WW Designs.

## V.    **CONCLUSION**

WW respectfully requests the Court deny Amazon's motion in its entirety, grant WW's motion in its entirety, and order a trial on damages.

Dated: November 21, 2025          Respectfully submitted,


_s/ George B. A. Laiolo_
George B. A. Laiolo, *pro hac vice*
California Bar No. 329850
Keith J. Wesley, *pro hac vice*
California Bar No. 229276
Matthew Venezia, *pro hac vice*
California Bar No. 313812
Elizabeth Carpenter, *pro hac vice*
California Bar No. 315674
Amanda Mannshahia, *pro hac vice*
California Bar No. 340619
Ellis George LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
Email:  glaiolo@ellisgeorge.com
Email:  kwesley@ellisgeorge.com
Email:  mvenezia@ellisgeorge.com
Email:  ecarpenter@ellisgeorge.com
Email:  amannshahia@ellisgeorge.com

Gary F. Franke, Trial Attorney
Ohio Bar No. 0029793
GARY F. FRANKE CO., LPA
201 E. Fifth Street, Suite 910
Cincinnati, Ohio 45202
Telephone: (513) 564-9222
Email:  gff@garyfrankelaw.com

*Attorneys for Plaintiff Weekend Warrior Clothing,*
*LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2025, a true and correct copy of the foregoing **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF WEEKEND WARRIOR CLOTHING, LLC'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** was served via the United States District Court CM/ECF system on all parties or persons requiring notice as follows:

| | |
|---|---|
| Gregory F. Ahrens<br>Wood Herron & Evans LLP<br>600 Vine Street, Suite 2800<br>Cincinnati, OH 45202<br>Telephone: (513) 241-2324<br>Email: gahrens@whe-law.com<br>Email: tyoung@whe-law.com (paralegal)<br><br>Todd M. Siegel<br>Ziyu Ma<br>Ryan L. Frei<br>Klaus H. Hamm<br>Klarquist Sparkman, LLP<br>121 SW Salmon Street, Suite 1600<br>Portland, Oregon 97204<br>Telephone: (503) 595-5300<br>Facsimile: (503) 595-5301<br>Email: todd.siegel@klarquist.com<br>Email: ziyu.ma@klarquist.com<br>Email: ryan.frei@klarquist.com<br>Email: klaus.hamm@klarquist.com<br>Email: amy.kendig@klarquist.com<br><br>Moez M. Kaba<br>Jessica N. Trafimow<br>Hueston Hennigan LLP<br>1 Little West 12th Street, 2nd Floor<br>New York, NY 10014<br>Telephone: (646) 930-0415 (Kaba)<br>Telephone: (212) 715-1123 (Trafimow)<br>Email: mkaba@hueston.com<br>Email: jtrafimow@hueston.com<br><br>Christine Woodin | Counsel for Defendants<br>AMAZON.COM SERVICES, LLC; and AMAZON.COM INC. |

Hueston Hennigan LLP
523 West 6th Street, Suite 400
Los Angeles, CA 90014
Telephone: (213) 788-4099
Facsimile: (888) 866-4825
Email: cwoodin@hueston.com

Sourabh Mishra
Hueston Hennigan LLP
620 Newport Beach, CA 92660
Telephone: (949) 356-5536
Facsimile: (888) 866-4825
Email: smishra@hueston.com

*s/George B. A. Laiolo*
George B. A. Laiolo

3080265